**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-HARVARD FACULTY CHAPTER; BOSTON UNIVERSITY CHAPTER OF THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS; SERVICE EMPLOYEES INTERNATIONAL UNION; SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 509; 32BJ SERVICE EMPLOYEES INTERNATIONAL UNION; AMERICANS FOR IMMIGRANT JUSTICE; ARELI ESMERALDA ROJAS CORREA; MIRIAM ESTHER MORENO COTO; MARIA FRANCISCA GUARDADO; IKECHI OBINNA NWAOZUZU; DERLY SNEIT SIERRA PALACIOS; and JULIETH MELISSA CAMARGO FIGUEROA,

*Plaintiffs*,

v.

Case No.

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; and JOSEPH B. EDLOW, in his official capacity as the Director of USCIS,

*Defendants*.

# COMPLAINT

# TABLE OF CONTENTS


APPENDIX .......... iii

INTRODUCTION .......... 1

JURISDICTION AND VENUE .......... 4

PARTIES .......... 5

BACKGROUND .......... 10

I. Overview of Adjusting to Lawful Permanent Resident Status under 8 U.S.C. § 1255(a) .......... 10

II. Obtaining LPR Status Through Consular Processing Is Significantly More Difficult than Through Adjustment under Section 1255(a) .......... 12

a. The Benefits of Adjustment of Status From Within the United States .......... 13

b. The Risks and Burdens of Consular Processing, Particularly for Immigrants from Countries the Administration Disfavors .......... 16

III. The May 21, 2026 USCIS Policy Memorandum, PM-602-0199 .......... 21

IV. The August 5th Denial Policy Memorandum .......... 24

V. The AOS and Denial Policies Contravene Congressional Intent .......... 27

a. Pre-Section 1255, the Executive Branch Created its Own “Adjustment” Process to Circumvent Congress .......... 28

b. Congress Enacted and Amended Section 1255 to End Preexamination and Regain Control over the Permanent Residency Process .......... 30

c. Over the Next 30 Years, Congress Repeatedly Adjusted Section 1255 to Respond to Executive Branch Intervention and Balance the Risk of Immigration Abuses Against Hardship .......... 32

d. Again Demonstrating Its Interest in and Authority to Balance Risk of Fraud Against Hardship, Between 1990 and 2000 Congress Added Adjustment Bars and Exceptions to Those Bars .......... 35

e. Other Amendments to the INA Confirm that Adjustment Is an Ordinary Feature of the INA, Not an Extraordinary Exception to Consular Processing .......... 37

VI. The AOS and Denial Policies Harm Plaintiffs, Their Members, and the Public .......... 38

a. Service Employees International Union .......... 40

b. Service Employees International Union, Local 32BJ (32BJ SEIU) .......... 44

c. Service Employees International Union, Local 509 (“SEIU Local 509”) .......... 45

d. American Association of University Professors (AAUP) .......... 47

e. Individual Plaintiffs .......... 53

CLAIMS FOR RELIEF .......... 58

COUNT I ....................................................................................................................58
COUNT II ..................................................................................................................60
COUNT III.................................................................................................................60
COUNT IV.................................................................................................................62
COUNT V ..................................................................................................................62
COUNT VI.................................................................................................................64
PRAYER FOR RELIEF ..............................................................................................65

# APPENDIX

| | |
|---|---|
| **LPR** | Legal Permanent Resident |
| **AOS Policy** | Policy allowing denial of an adjustment application if the noncitizen does not leave the United States and apply from abroad absent outstanding circumstances. |
| **Denial Policy** | Policy allowing denial of benefit applications without providing the applicants with any opportunity to submit additional evidence. |
| **Adjustment** | Applying for LPR status while physically present in the United States<br>(INA process) |
| **Consular Processing** | Applying for LPR status at a U.S. consulate abroad |
| **Form I-485** | Application for adjustment of status |
| **Form I-130** | Family based visa petition |
| **Form I-140** | Employment based visa petition |
| **RFE** | Request for Evidence |
| **NOID** | Notice of Intent to Deny – USCIS Officer explanation for the proposed basis for denial and permitting a response |
| **K-visa** | Family visa for marrying a U.S.-citizen |

| | |
|---|---|
| **H-1B** | Specialized worker employment visa (Dual Intent) |
| **L-1** | Intracompany transferee visa (Dual Intent) |
| **EB-2** | Employment visa for professionals holding an advanced degree or with exceptional ability |
| **National Interest Waiver** | Waiver of the labor certification requirement for an EB-2 visa |

## INTRODUCTION

1. For many decades, immigrants already in the United States with a lawful basis to stay here were able to apply to become Legal Permanent Residents (LPRs)—colloquially, to receive a green card—without having to first leave the country and apply for an immigrant visa from outside the U.S., in either their home country or a third country. The result of carefully crafted, iterative Congressional policy making, this policy preserved family unity and workforce continuity by allowing applicants to stay in the United States while their applications were evaluated, while still providing immigration officials ample opportunity to vet them.

2. The Trump-Vance administration recently upended the status quo by promulgating two unlawful policies that, in combination, now require such immigrants to depart the United States and initiate the LPR process from abroad, or risk denial of their applications. This is true even for immigrants who applied for their green cards well before these two policies were issued.

3. Predictably, this abrupt, unexplained, and needlessly cruel policy change has thrown the lives of immigrant families and communities into chaos and uncertainty. For but one example, Plaintiff Miriam Esther Moreno Coto, who has been living lawfully in the United States for 26 years, will have to abandon her three U.S. citizen children and leave her job and the community she has called home for nearly three decades in order to return to her native El Salvador and from there, apply for permission to return to the United States as a legal permanent resident. For another**,** Plaintiff Ikechi Obinna Nwaozuzu, a Nigerian national, will have to leave his job as a Senior Analyst at Comcast Corporation to apply from abroad, where he may face visa restrictions preventing him from returning to the U.S. This will set his career back, potentially for years, and harm the employer who relies on him.

4. Congress created the adjustment of status scheme—codified in 8 U.S.C. § 1255—in the Immigration and Nationality Act of 1952 (INA). In the 74 years since, Congress has

amended 8 U.S.C. § 1255 no less than 25 times, yielding a carefully calibrated adjustment scheme that balances America's strong interests in preserving family unity and preventing abuse—yet it has *never once* imposed a general requirement that otherwise eligible applicants leave the United States in order to get a green card or risk having their applications denied. And for nearly 75 years Department of Homeland Security (DHS) subcomponent U.S. Citizenship and Immigration Services (USCIS) and its predecessor agency, Immigration and Naturalization Service (INS) have *never* understood the INA to authorize a categorical rule penalizing green card applicants for choosing to adjust status domestically, where eligible to do so, rather than leaving the United States to apply from abroad. Until now.

5. On May 21, 2026, USCIS issued an unprecedented new policy, PM-602-0199, titled "Adjustment of Status is a Matter of Discretion and Administrative Grace, and an Extraordinary Relief that Permits Applicants to Dispense with the Ordinary Consular Visa Process," (the "AOS Policy"). The AOS Policy proclaims that the provision of a green card is an "extraordinary" departure from normal immigration procedures, and directs USCIS officers to view the failure of those seeking a green card to leave the United States and apply from abroad as a negative factor that presumptively requires denial of an application absent "unusual or even outstanding" countervailing considerations. *See* AOS Policy at 5, https://perma.cc/XK66-NHCD.

6. Then on August 5, 2026, USCIS issued another draconian policy change, through a memorandum titled "Evidence, Requests for Evidence, and Notices of Intent to Deny," (the "Denial Policy"), which authorizes USCIS employees to deny benefit applications, including those to obtain a green card, without providing the applicants with any opportunity to submit additional evidence relevant to the AOS Policy, even if their applications were filed before the AOS Policy was in effect, and applicants would have had no reason to have submitted evidence relevant to that policy. *See* PA-2026-05, Denial Policy at 2-3, https://perma.cc/N8EB-WV8T.

7. The AOS and Denial Policies (together, the "Policies") have had the intended effect of throwing noncitizens living in the United States and their loved ones and communities into an indefinite state of limbo and fear. Longterm residents like Ms. Moreno Coto, who have waited years to secure a green card, now have reason to believe they will never be granted LPR status unless they leave their families, communities, and livelihoods indefinitely while they wait for the government to adjudicate their applications from abroad. Employees like Mr. Nwaozuzu face the prospect of losing their work permits, their careers and livelihoods, and their ability to provide for their families. The Policies will tear families apart, forcing years of separation and leaving children to grow up without parents or other loved ones. And employers, in education, healthcare, and other critical industries, will lose teachers, doctors, and other talented workers, significantly undermining the vitality of the American economy and education system.

8. The Policies are as cruel as they are short-sighted, and they are illegal many times over. The AOS Policy exceeds Defendants' statutory authority under the INA, which nowhere authorizes the government to penalize green card applicants for not leaving the United States to seek LPR status abroad; it is arbitrary and capricious and was issued without statutorily required procedures in violation of the APA; and it conflicts with binding agency regulations, decisions, and policy guidance in contravention of the *Accardi* doctrine as articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

9. The Denial Policy was issued without statutory authority; is arbitrary and capricious and was issued without statutorily required procedures in violation of the APA; and likewise conflicts with binding agency regulations, decisions, and policy guidance in contravention of the *Accardi* doctrine.

10. And together, the Policies violate the APA and the Due Process Clause of the Fifth Amendment by impermissibly applying retroactively, thereby preventing green card applicants

from submitting new evidence relevant to the AOS Policy, when they filed their applications in reliance on the settled expectation that they would be able to supplement their pending applications if new policies impacting their eligibility to adjust status in the United States were issued after filing.

11. Plaintiffs include the American Association of University Professors (AAUP) and its Harvard Faculty and Boston University chapters, Service Employees International Union (SEIU) and its 32BJ and Local 509 affiliates, Americans for Immigrant Justice (AI Justice), and individual adjustment applicants directly subject to the challenged Policies. Without relief from this Court, individual Plaintiffs, clients of the organizational Plaintiff AI Justice, and members of the associational Plaintiffs AAUP and SEIU—all noncitizens in a period of authorized stay who are at risk of losing their statutorily-provided opportunity for legal status and other benefits in this country—will be significantly harmed by being separated from their families and communities, deprived of work and other opportunities, and forced to abandon pursuit of their lawful residence in this country or lose their legal right to live and work here. And AI Justice, whose core mission includes serving noncitizens seeking to obtain a green card, faces a certain harm to their core business activities and depletion and diversion of resources needed to address the crisis of their client communities facing the same harms.

## JURISDICTION AND VENUE

12. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the Administrative Procedure Act (APA), 5 U.S.C. § 551 et seq. and the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq. and its implementing regulations.

13. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because each defendant is an agency of the United States or an officer or employee of the United States sued in

their official capacity; it is the judicial district where Plaintiffs AAUP-Harvard Faculty Chapter, AAUP-Boston University and SEIU Local 509 have their principal place of business; and no real property is involved in this action.

## PARTIES

14. **Plaintiff American Association of University Professors** (AAUP) is a nonprofit membership association and labor union of faculty, graduate students, postdoctoral fellows, and other academic professionals, with chapters at colleges and universities throughout the country, including in Massachusetts. Founded in 1915, AAUP works to advance academic freedom and shared governance, promote the economic security of those engaged in teaching and research, and advocate for its members in their relationships with universities and government. Many AAUP members are noncitizens who hold academic and research positions in the United States and are pursuing, or plan to pursue, permanent residence through employment-based or family-sponsored immigration pathways. Other members are U.S. citizens whose spouses or other close relatives are pursuing permanent residence. AAUP brings this lawsuit on behalf of its members.

15. **Plaintiff American Association of University Professors-Harvard Faculty Chapter** (AAUP-HFC) is a chapter of AAUP at Harvard University, founded in June 2024. As of February 2026, it had 312 members drawn from across Harvard's schools, including tenured and non-tenure-track faculty, researchers, and graduate students. AAUP–HFC advocates for academic freedom, shared governance, and the economic security of those who teach and conduct research at the university. Its members include noncitizen academics who are pursuing or plan to pursue permanent residence while continuing their work at Harvard. AAUP–HFC brings this lawsuit on behalf of its affected members.

16. **Plaintiff Boston University Chapter of the American Association of University Professors** (BU AAUP) is an AAUP advocacy chapter at Boston University. Reestablished in

2021, it has grown to more than 300 members across the university's schools and departments. Its membership includes faculty, graduate-student workers, and other instructional and research employees. BU AAUP advocates for academic freedom, faculty participation in university governance, and the interests of academic workers across different types of appointments. Its members include noncitizen academics seeking to complete their training and establish careers in the United States while pursuing permanent residence. BU AAUP brings this lawsuit on behalf of its affected members.

17. **Plaintiff Service Employees International Union** (SEIU) is a labor organization headquartered in Washington, D.C. Founded in 1921 by immigrant janitors from Eastern Europe, Africa, Turkey, Spain, and Ireland, today SEIU represents approximately two million working people united by the belief in the dignity and worth of workers and the services they provide. SEIU has more than 150 affiliates across the United States, Puerto Rico, and Canada, including in Massachusetts. SEIU members work in health care, the public sector, and in property services, including as physicians, technicians, long-term care workers, janitors, security officers, airport workers, librarians, childcare workers, educators, fast food workers, and employees who work for city, county, and federal governments. SEIU members include noncitizens who have applied or plan to apply to adjust their status and U.S. citizens whose close family relatives have applied or plan to apply to adjust their status. SEIU brings this lawsuit on behalf of its membership.

18. **Plaintiff Service Employees International Union Local 509** (SEIU 509) is a local affiliate of SEIU that represents over 23,000 human service workers and educators throughout Massachusetts. SEIU 509's members work for a wide array of employers including state social service agencies, private-sector human service providers, universities, and small business owners providing state-funded family care. SEIU Local 509 has a large immigrant membership, including members who are authorized to work and are applying for adjustment of status to obtain lawful

permanent resident status in the United States. Its principal place of business is at 293 Boston Post Road West, 4th Floor, Marlborough, MA 01752. SEIU 509 brings this lawsuit on behalf of its membership.

19. **Plaintiff 32BJ Service Employees International Union** (32BJ SEIU) is the largest union of property service workers in the United States, with over 185,000 members. Its members work as cleaners, property maintenance workers, doormen, security officers, airport workers, window cleaners, building engineers, school and food service workers, and railroad and factory workers. The union represents members across the Northeast in Massachusetts, New Hampshire, Rhode Island, Connecticut, New Jersey, New York, Delaware, Pennsylvania, Maryland, Northern Virginia, and Washington, D.C. The local union also represents workers in southern Florida and as far west as Montana. In Massachusetts, specifically, 32BJ SEIU represents approximately 22,000 workers across the state. The Massachusetts office is located at 26 West Street in Boston, MA.

20. **Plaintiff Americans for Immigrant Justice** (AI Justice) is a nonprofit legal-services organization headquartered in Miami, Florida. Founded in January 1996, AI Justice has served immigrant communities for more than thirty years. Its mission is to protect and promote immigrants' rights through a combination of free direct legal services, impact litigation, policy advocacy, outreach, and public education. AI Justice has served more than 150,000 immigrants. AI Justice brings this lawsuit on behalf of itself.

21. **Plaintiff Areli Esmeralda Rojas Correa** was born in Mexico in 1997 and entered the United States in 1999, as a one-year-old, through the San Ysidro Port of Entry. She has lived in the United States ever since and has long resided in the San Francisco Bay Area. She was granted DACA in 2013 when she was fifteen and has maintained that status continuously since then, with no criminal arrests or convictions. Ms. Rojas is married to a naturalized U.S. citizen and is an

applicant for a green card based on that marriage. Since approximately 2019, she has worked in immigration law and is currently employed as a senior paralegal at a leading immigration law firm. USCIS approved the family-based immigrant petition filed by her husband after her May 2026 adjustment interview, but her green card application remains pending under the AOS Policy. At that interview, the officer questioned why she was seeking a green card in the United States rather than consular processing abroad.

22. **Plaintiff Miriam Esther Moreno Coto** is a native and citizen of El Salvador who has lived in the United States for approximately 26 years. She is the mother of three U.S. citizen children and has substantial family, employment, and community ties in the United States. Her most recent TPS approval was scheduled to expire on September 9, 2026. USCIS has since announced that Salvadoran TPS holders retain protection, including work authorization, pending a further announcement. Ms. Moreno's son, a U.S. citizen, petitioned for her green card. At her July 2026 interview, the officer repeatedly questioned why she sought adjustment in the United States rather than consular processing abroad.

23. **Plaintiff Maria Francisca Guardado** is a native and citizen of El Salvador who entered the United States in 1998 and obtained TPS in 2001. Based on a family-based immigrant visa petition filed on her behalf, Ms. Guardado filed her adjustment application on October 17, 2022. USCIS denied that application on September 2, 2026. Although USCIS expressly found Ms. Guardado eligible for adjustment, it denied her application as a matter of discretion after citing her immigration history, a 1999 arrest for which the charge was dismissed, and alleged nondisclosures on earlier TPS applications. Ms. Guardado filed a motion to reopen or reconsider with USCIS's Administrative Appeals Office, which remains pending.

24. **Plaintiff Ikechi Obinna Nwaozuzu** is a Nigerian national residing in Houston, Texas. His employment-based immigrant petition has been pending since November 22, 2024, and

he filed an application to adjust status on April 2, 2026. He maintains F-1 student status through August 22, 2027, and works at Comcast Corporation through curricular practical training ("CPT") as a Senior Analyst. In that role, he analyzes sales and channel performance data and develops forecasting, broadband-deployment, and market-expansion analytics that inform Comcast's broadband and mobile-service strategy. His adjustment application remains pending under the AOS Policy, and if USCIS denies it and he must pursue an immigrant visa abroad, he could face restrictions on immigrant-visa issuance to Nigerian nationals.

25. **Plaintiff Derly Sneit Sierra Palacios** is a Colombian national living in Utah with her husband and their two U.S. citizen children, ages six and three. Her employment-based immigrant petition has been pending since April 22, 2024, and she filed her adjustment application on February 18, 2026. She maintains F-1 student status through December 30, 2030, and her adjustment application remains pending. A denial could require her to pursue permanent residence abroad without a predictable return date, forcing her either to separate from her husband and two young U.S. citizen children in Utah or uproot them from the home and community they have established there.

26. **Plaintiff Julieth Melissa Camargo Figueroa** is a Colombian citizen living in North Carolina with her husband and their eight-year-old son. She filed an employment-based adjustment application on April 13, 2026, while her employment-based immigrant petition was pending. She worked as a high school Spanish and ESL teacher beginning in 2021, but her J-1 status ended in June 2026, and she is not currently working. She has applied for employment authorization based on her pending adjustment application and hopes to return to teaching. A denial could cut off that route back to the classroom and require her to pursue permanent residence abroad while her son remains settled in school in North Carolina.

27. **Defendant Markwayne Mullin** is sued in his official capacity as the Secretary of

Homeland Security. In this capacity, he directs each of the component agencies within DHS, including USCIS. In his official capacity, Defendant Mullin is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

28. **Defendant DHS** is an executive agency of the United States. DHS and its components, including USCIS, are the agencies principally charged with implementing and enforcing the immigration laws and policies of the United States.

29. **Defendant USCIS** is the sub-agency within DHS responsible for, among other things, adjudicating requests for immigration benefits, including applications to adjust status to lawful permanent resident filed within the United States. *See* 6 U.S.C. § 271.

30. **Defendant Joseph B. Edlow** is sued in his official capacity as the Director of USCIS.

## BACKGROUND

### I. Overview of Adjusting to Lawful Permanent Resident Status under 8 U.S.C. § 1255(a)

31. Congress has enacted a comprehensive statutory scheme to regulate immigration—the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq.—which authorizes various federal agencies to enforce and administer immigration law and limits the scope of their authority to do so.

32. The INA sets forth two processes for a noncitizen to become an LPR (more informally, "green card holder") based on their "eligib[ility] to receive an immigrant visa" and that visa being "immediately available" to them[1]: (i) adjusting to LPR status while physically present in the United States (*i.e.*, adjustment), *see* 8 U.S.C. § 1255(a); or (ii) consular processing—

[1] Other processes exist for a noncitizen to become an LPR on a different basis. *See, e.g.*, 8 U.S.C. § 1159 (refugees and asylees); 8 U.S.C. §§ 1186a(c)-(d), 1186b(c)-(d) (conditional permanent residents); 8 U.S.C. § 1229b (cancellation of removal); 8 U.S.C. § 1259 (registry); 8 U.S.C. § 1255(j), (l)-(m) (S-, T-, or U-visa holders).

applying for, and obtaining, an immigrant visa at a U.S. consulate abroad in order to apply for admission to the United States as an immigrant, *see generally* 8 U.S.C. §§ 1154, 1201.

33. Consular processing is available to any noncitizen eligible for an immigrant visa. 8 U.S.C. § 1202(a). Adjustment is discretionary "under such regulations" as the Secretary of Homeland Security may provide and subject to additional requirements, bars, and exceptions to those bars. 8 U.S.C. § 1255(a), (c)-(h), (k); *see also* 6 U.S.C. § 271 (transfer of functions to the DHS Secretary). However, the Secretary lacks legal authority to create blanket eligibility rules that conflict with the statutory requirements, bars, and exceptions for adjustment specifically or the INA generally. *See Succar v. Ashcroft*, 394 F.3d 8, 24 (1st Cir. 2005).

34. Statutory requirements for adjustment are fourfold: the noncitizen (i) has either been "inspected and admitted[2] or paroled[3] into the United States" or has "an approved petition for classification as a VAWA self-petitioner" (*i.e.*, was the victim of domestic abuse by a U.S. citizen or LPR spouse, former spouse, child, or parent), 8 U.S.C. § 1255(a); (ii) is "eligible to receive an immigrant visa," *id.* § 1255(a)(2); (iii) is "admissible to the United States for permanent residence," *id.*; and (iv) an immigrant visa "is immediately available to [the noncitizen] at the time [their adjustment] application is filed," *id.* § 1255(a)(3).

35. Statutory bars to adjustment exist for unlawful presence, unlawful employment, terrorist activities, holding certain immigration statuses, and violating the terms of a nonimmigrant visa. 8 U.S.C. § 1255(c)-(d), (f). There are exceptions to the unlawful presence bar and one

---

[2] The term "admitted" means "with respect to [a noncitizen], the lawful entry of the [noncitizen] into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A); *see also* 8 U.S.C. § 1225(a)-(b) (outlining inspection procedures for those seeking admission).

[3] The term "paroled" refers to a noncitizen "applying for admission to the United States" who is not admitted but instead permitted to enter "the United States temporarily . . . on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

unlawful employment bar for immediate relatives (*i.e.*, "the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age") and certain special immigrants. *Id.* §§ 1151(b)(2)(A)(i), 1255(c)(2). Immediate relatives are also excepted from several immigration status bars. *Id.* §§ 1151(b)(2)(A)(i), 1255(c)(2). And noncitizens adjusting based on eligibility for an employment-based visa are exempt from the unlawful presence and unlawful employment bars if the "aggregate period" of unlawful presence and employment does not exceed 180 days. *Id.* § 1255(c)(2), (7)-(8), (k).

36. Applicable regulations track the above statutory requirements, bars, and exceptions. *E.g.*, 8 C.F.R. § 245.1(a) (a noncitizen physically present in the United States may apply to adjust if eligible to receive an immigrant visa and that visa is "immediately available" when the application is filed); *id.* § 245.1(b)–(c) (specifying ineligibility grounds and exceptions, including, but not limited to, exempting immediate relatives of U.S. citizens from ineligibility premised on several criteria).

37. In recent years, roughly half of all noncitizens granted LPR status secured their status from within the United States through the adjustment process without needing to leave the country.[4]

## II. Obtaining LPR Status Through Consular Processing Is Significantly More Difficult than Through Adjustment under Section 1255(a)

38. Regardless of whether a noncitizen present in the United States seeks LPR status through adjustment or consular processing, the first step is the same: establishing eligibility for an immigrant visa.

---

[4] Off. of Homeland Sec. Stat., *Table 6. Persons Obtaining Lawful Permanent Resident Status by Type and Major Class of Admission: Fiscal Years 2015 to 2024*, U.S. Dep't of Homeland Sec. (June 16, 2026), https://perma.cc/252X-WTLR (782,800 of 1,364,090 recipients (57 percent) in fiscal year 2024).

39. For family-sponsored immigrants, that step usually requires a qualifying relative to file an immigrant petition with USCIS. For employment-based immigrants, an employer usually files the immigrant petition, although Congress and USCIS permit self-petitioning in certain categories.[5] Once that basis for permanent residence is established, the next steps depend on whether the noncitizen pursues adjustment in the United States or consular processing abroad.

**a. The Benefits of Adjustment of Status From Within the United States**

40. If the noncitizen eligible for an immigrant visa pursues LPR status through adjustment, they file Form I-485, Application to Register Permanent Residence or Adjust Status, with USCIS from within the United States.[6] Depending on the immigrant category and visa availability, the adjustment application may be filed at the same time as the immigrant petition, while that petition remains pending, or after it is approved. *See* 8 C.F.R. § 245.2(a)(2)(i). Visa availability matters principally for family-preference and employment-based applicants because those categories are numerically limited. Immediate relatives of U.S. citizens, by contrast, are not subject to those numerical limits.[7] While an adjustment application is pending, an applicant may

---

[5] Family-sponsored petitions are generally filed on Form I-130 and employment-based petitions on Form I-140. Certain employment-based LPR applicants may self-petition, including extraordinary-ability applicants and applicants seeking a national interest waiver. Other immigrant categories use different petition forms. *See* 8 C.F.R. §§ 204.1(a)(1), 204.5(a); USCIS, *Instructions for Petition for Alien Relative, and Supplemental Information for Spouse Beneficiary*, Form I-130 at 1 (Apr. 1, 2024), https://perma.cc/M8MA-F2V6; USCIS, *Instructions for Petition for Alien Workers*, Form I-140 (June 7, 2024), https://perma.cc/C6ZL-3RVN; USCIS, *Instructions for Petition for Amerasian, Widow(er), or Special Immigrant*, Form I-360 (Jan. 20, 2025), https://perma.cc/C3ST-X5XB.

[6] USCIS, *I-485, Application to Register Permanent Residence or Adjust Status* (last updated Sep. 18, 2026), https://perma.cc/8AXW-U6MA.

[7] For numerically limited categories, visa availability generally turns on whether the applicant's priority date is earlier than the applicable date in the Department of State's Visa Bulletin. The priority date ordinarily derives from the filing of the immigrant petition or, in some employment-based categories, the labor certification. *See* 8 C.F.R. §§ 204.1(b), 204.5(d), 245.1(g)(2). If visa availability later retrogresses, USCIS may hold an otherwise approvable adjustment application until a visa again becomes available. *See* 8 C.F.R. §§ 245.1(g)(1), 245.2(a)(2)(i); 7 USCIS, *Policy Manual* pt. A, ch. 6 (current as of Sep. 23, 2026), https://perma.cc/6DZB-5N4P.

in many cases obtain work authorization. 8 C.F.R. § 274a.12(c)(9).

41. USCIS reviews the adjustment application and supporting evidence and may require the applicant to appear for biometrics or an interview.

42. The USCIS officer adjudicating an adjustment application may issue a request for evidence (RFE) if additional evidence may establish eligibility. 8 C.F.R. § 103.2(b)(8). The officer also may issue a notice of intent to deny (NOID), explaining the proposed basis for denial and permitting a response. *Id.* As explained below, the Denial Policy favors denial over the issuance of an RFE or NOID.[8] *See infra* ¶¶ 76-79.

43. USCIS must adjudicate adjustment applications in accordance with binding Board of Immigration Appeals (BIA) precedent. 8 C.F.R. § 1003.1(g)(1). USCIS adjudicators also follow the USCIS Policy Manual, the agency's repository of official adjudicatory policies.

44. Under section 1255(a) and the regulations, USCIS has discretion to deny adjustment even if the applicant is otherwise eligible.[9] But that discretion has traditionally required an individualized assessment of the applicant's circumstances, including both favorable and unfavorable factors. Relevant considerations have included family ties, length of residence, employment and tax history, character and conduct, military service, and humanitarian concerns.[10]

45. While the discretionary analysis is generally holistic and the deciding officer has "some autonomy in the way in which he or she decides a particular case," that analysis must still

[8] Adjustment denials generally are not administratively appealable, although a motion to reopen or reconsider may be available. *See* 8 C.F.R. §§ 103.3(a)(2), 103.5(a), 1003.3(a)(2); 6 USCIS *Policy Manual*, pt. H, ch. 11 (current as of Sep. 23, 2026), https://perma.cc/LAB5-3WNF; USCIS, *Instructions for Notice of Appeal or Motion*, Form I-290B (May 31, 2024), https://perma.cc/4ZJ7-SP3Q; 7 USCIS *Policy Manual*, pt. A, ch. 11 (current as of Sep. 23, 2026), https://perma.cc/TA8G-KNEQ.

[9] *See* 1 USCIS *Policy Manual*, pt. E, ch. 8 (current as of Sep. 23, 2026), https://perma.cc/59JU-6FFU; *see* 7 USCIS *Policy Manual* (current as of Sep. 23, 2026), https://perma.cc/B9HQ-6E4S.

[10] *See* 7 USCIS *Policy Manual*, pt. A, ch. 10 (current as of Sep. 23, 2026), https://perma.cc/AY35-LY9Y.

follow BIA precedent regarding the proper weighing of relevant factors and "cannot be arbitrary, inconsistent, or dependent on intangible or imagined circumstances."[11]

46. Neither BIA precedent nor the Policy Manual treats an eligible applicant's decision to pursue adjustment rather than consular processing as a negative factor, much less one requiring "unusual or even outstanding equities" to overcome. AOS Policy at 5.

47. To the contrary, longstanding precedent provides that, absent unfavorable factors such as committing fraud to enter the United States, adjustment ordinarily should be granted as a matter of discretion,[12] and the Policy Manual reflects this presumption.[13] Even where legally permissible negative factors are present, USCIS is required to treat certain other factors as sufficient to overcome adverse factors. For example, ties to U.S. citizens, including as an immediate relative, are "special and weighty equit[ies]."[14] Decades ago, the BIA adopted a "policy" that such equities generally outweigh "serious adverse factor[s]," including even entering the country with a "preconceived intent" to circumvent ordinary immigration procedures.[15]

48. Similarly, although unauthorized employment generally is considered an adverse factor, the BIA directs that "this factor alone should not ordinarily result in the discretionary denial of adjustment of status to those individuals who are statutorily eligible for that relief," such as immediate relatives and certain special immigrants and employment-based applicants, *supra* ¶ 35,

---

[11] 1 USCIS *Policy Manual*, *supra* note 9.

[12] *Matter of Arai*, 13 I. & N. Dec. 494, 495-96 (BIA 1970); *accord Matter of Blas*, 15 I. & N. Dec. 626, 642 (A.G. 1976) ("Although adjustment is not necessarily available on a simple showing of eligibility, that showing, particularly where eligibility carries with it its own strong equities, as with immediate relative status, can have a positive influence on the exercise of discretion *and in the absence of adverse circumstances should prevail.*") (emphasis added).

[13] 1 USCIS *Policy Manual*, *supra* note 9 ("Generally, if there are no negative factors to weigh against that positive factor, denial of the benefit would be an inappropriate use of discretion.").

[14] *Matter of Ibrahim*, 18 I. & N. Dec. 55, 57 (BIA 1981); *see Matter of Cavazos*, 17 I. & N. Dec. 215, 217 (BIA 1980) (similar); *Matter of Garcia*, 16 I. & N. Dec. 653, 658 (BIA 1978) (similar).

[15] *Ibrahim*, 18 I. & N. Dec. at 57; *Cavazos*, 17 I. & N. Dec. at 217.

"and who present no other negative considerations."[16]

49. Conversely, BIA precedent makes clear that a showing of "unusual" or "outstanding" positive equities is not required in the run-of-the-mill adjustment case, but rather, may be necessary only where particularly serious adverse factors (such as serious criminal history) are present.[17] The USCIS Policy Manual mirrors this precedent, directing officers that where "negative factors grow more serious, a favorable exercise of discretion may not be warranted" without additional offsetting favorable factors, and only in those circumstances may an applicant be required to demonstrate unusual or outstanding equities.[18]

**b. The Risks and Burdens of Consular Processing, Particularly for Immigrants from Countries the Administration Disfavors**

50. If a noncitizen eligible for an immigrant visa pursues LPR status through consular processing, USCIS generally forwards the approved immigrant petition to the National Visa Center of the Department of State (DOS). The applicant then submits an immigrant-visa application and supporting documents.[19]

51. Before receiving an immigrant visa, the applicant must complete a medical examination and appear for an in-person interview at a U.S. embassy or consulate, generally in the applicant's country of residence or nationality. While exceptions could be made, since November 2025,[20] DOS has restricted exceptions to certain "rare" events. Also, some applicants must instead travel to a designated third country because immigrant-visa services are unavailable where they live. If a consular officer issues the visa, the applicant must then return to a U.S. port of entry and

---

[16] *Matter of Khan*, 17 I. & N. Dec. 508, 510 (BIA 1980).
[17] *Matter of Mendez-Moralez*, 21 I. & N. Dec. 296, 300 (BIA 1996) (en banc); *Matter of Edwards*, 20 I. & N. Dec. 191, 195 (BIA 1990); *Matter of Marin*, 16 I. & N. Dec. 581, 585 (BIA 1978).
[18] 1 USCIS *Policy Manual*, *supra* note 9.
[19] U.S. Dep't of State, *Adjudicating Immigrant Visa (IV) Applicants in Their Country of Residence*, Travel.State.Gov, https://perma.cc/RHV5-JKVR (last updated July 15, 2026).
[20] *Id.*

be admitted as a permanent resident.

52. For a noncitizen already living in the United States, those additional steps can carry substantial consequences. Adjustment generally permits the applicant to remain here with family, continue working or studying if otherwise authorized, and respond to USCIS from within the country. Consular processing requires departure, with no assurance that the applicant will be able to return on a predictable timetable.

53. Visa applicants must be abroad in their consular processing country for enough time to complete the medical examination and attend the visa interview. Even applicants with family in that country may be required to spend weeks or months far from their in-country support system because the United States often has only one consular post within a country that adjudicates immigrant visas.[21]

54. A consular officer may decline to issue the visa while seeking additional information or conducting "administrative processing." Visa applicants without another valid basis for admission may then be unable to return to the United States to work, attend school, or rejoin family (unlike an adjustment applicant who can continue these activities when USCIS issues and processes a response to an RFE, or seeks additional information from another government agency).

55. Waiting abroad can mean lost employment, interrupted education, and prolonged separation from family. For an employment-sponsored immigrant, loss of the sponsoring job may also undermine the basis for permanent residence.

56. Departure can carry an additional consequence for applicants who have accrued unlawful presence in the United States. The act of leaving may trigger a statutory bar preventing their return for years. Congress permits some family-based applicants to seek a provisional waiver

[21] U.S. Dep't of State, *List of U.S. Embassies and Consulates that Process Immigrant Visas*, Travel.State.Gov, https://perma.cc/U399-8AZL (last visited Oct. 5, 2026).

before departure, but that process itself can involve substantial delay and does not guarantee issuance of an immigrant visa.[22]

57. Visa applicants who cannot undergo consular processing in their home countries, *see supra* ¶ 51, must have the funds and ability to travel to a designated third country that may refuse to admit them or not permit them to remain long enough to have their immigrant visa adjudicated, particularly if they end up in administrative processing.[23]

58. Compounding the difficulties of an already burdensome process, this Administration has implemented multiple actions that have severely limited immigrant-visa issuance abroad and, for many noncitizens, the ability to return to the United States after departure for consular processing.

59. As a result of the President's January 20 and June 10, 2025 Executive Orders (together, "Travel Ban"), nationals of 39 countries are barred from entering the United States, and therefore from receiving visas, absent a waiver or other limited exception.[24] The Travel Ban generally applies to nationals who were outside the United States and lacked a valid visa on the applicable effective date. For persons within its scope, consular processing cannot provide a route back into the United States and LPR status unless an exception or waiver is granted. And for

[22] Departure after more than 180 days of unlawful presence generally triggers a three-year inadmissibility bar; departure after one year generally triggers a ten-year bar. 8 U.S.C. § 1182(a)(9)(B)(i). Certain spouses and children of U.S. citizens or LPRs may seek a provisional waiver by demonstrating extreme hardship to a qualifying relative. 8 U.S.C. § 1182(a)(9)(B)(v); 8 C.F.R. § 212.7(e). USCIS currently reports a 28-month processing time for 80 percent of provisional-waiver applications. USCIS, *Case Processing Times*, https://perma.cc/LL8M-KVX4 (last visited Oct. 5, 2026).

[23] *See, e.g.*, U.S. Dep't of State, *U.S. Embassy Warsaw, Poland - WRW*, Travel.State.Gov (last updated July 29, 2026), https://perma.cc/VJ9V-E3WT; Ministry of Foreign Affairs Republic of Poland, *VISAS*, gov.pl, https://perma.cc/PGH7-Q9K6 (last visited Oct. 5, 2026).

[24] *See* Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025); Proclamation No. 10949, 90 Fed. Reg. 24497 (June 10, 2025); Proclamation No. 10998, 90 Fed. Reg. 59717 (Dec. 19, 2025) (together with Proclamation No. 10949, the "Travel Ban").

noncitizens already present in the United States, the Travel Ban shows that the path to permanent residence depends not on the domestic adjustment process Congress authorized, but on overseas visa issuance and subsequent admission under a changing regime of entry restrictions, exceptions, and discretionary waivers.

60. DOS subsequently imposed a broader restriction. On January 21, 2026, the agency announced that it would indefinitely pause the issuance of immigrant visas to nationals of 75 countries, the majority of which are not subject to the 39-country travel ban.[25] Affected applicants may continue to submit applications and attend interviews, but, apart from limited exceptions, DOS will not issue them immigrant visas.[26]

61. Even for immigrant visa applicants not subject to the 75-country pause, DOS has made consular processing far more difficult to access in several ways. First, starting in November 2025, DOS eliminated consular post flexibility in permitting exceptions to the general requirement that immigrant visa applicants interview in the consular district designated for their place of residence or, upon the applicant's request, in their country of nationality. Since November 2025, applicants seeking to interview elsewhere must obtain a limited exception based on a humanitarian or medical emergency or foreign policy considerations.[27]

62. Second, DOS has reduced its visa processing footprint abroad, especially in Africa,

---

[25] *See* U.S. Dep't of State, *Immigrant Visa Processing Updates for Nationalities at High Risk of U.S. Public Benefits Reliance*, Travel.State.Gov (last updated Aug. 28, 2026), https://perma.cc/88VR-7SV8.

[26] Although the policy has since been declared unlawful, it remains unclear whether the government is actually complying with that court order. *See Cath. Legal Immigr. Network, Inc. (CLINIC) v. Rubio*, No. 26-cv-00858 (JAV), 2026 WL 2455099, at *1 (S.D.N.Y. Aug. 21, 2026) (finding the policy contrary to law and that it was issued in excess of Secretary Rubio's statutory authority and vacating it under the APA); *see* Order to Show Cause, *Cath. Legal Immigr. Network, Inc. v. Rubio*, No. 1:26-cv-00858 (S.D.N.Y. Sep. 24, 2026), Dkt. 108 (order to show cause why the government should not be subject to an injunction for non-compliance with the Court's order).

[27] U.S. Dep't of State, *supra* note 19.

which will require more noncitizens to complete consular processing in designated third countries (if they can even reach these countries and support themselves while there).[28]

63. Third, on August 13, 2026, the BIA overruled a 14-year precedent decision, which had made it possible for certain noncitizens who had accrued unlawful presence in the United States to travel abroad with advance parole and thereby avoid triggering a statutory bar to their return. *See Matter of Milagro Delcarma-Lara*, 29 I. & N. Dec. 830, 835 (BIA 2026), *overruling Matter of Arrabally & Yerrabelly*, 25 I. & N. Dec. 771 (BIA 2012). Instead, the BIA has deemed the travel abroad with advance parole[29] to be a "departure," which would bar noncitizens who had been unlawfully present in the United States for more than 180 days after reaching age 18 from returning to the United States for several years. This means that the mere act of traveling abroad to pursue consular processing will likely trigger inadmissibility, and therefore ineligibility for LPR status, for a noncitizen who has accrued unlawful status, even if the noncitizen obtains advance parole before traveling.

64. USCIS could extend the decision to bar TPS recipients who have accrued unlawful presence and later travel abroad using the TPS-specific travel document.[30]

65. In short, the Administration and Defendants have barred immigrant visa processing through consular processing abroad for many applicants, while also generally making it more

---

[28] *See* Matthew Lee & Sam Mednick, *US to drastically slash the number of embassies in Africa that can process visas*, Wash. Post (June 1, 2026), https://perma.cc/3LCS-QDPS (reporting a plan to reduce the number of embassies and consulates processing visa applications from 50 to just 20 processing locations "in the coming weeks"); U.S. Dep't of State, *supra* note 21 (listing dozens of countries where immigrant visa processing is not possible).

[29] Advance parole allows certain immigrants who did not enter the country lawfully (including, e.g., those with deferred action) to request advance permission to enter the country through parole and leave the country without accruing unlawful status as a result. *See* U.S. Customs and Border Prot., *Advance Parole* (Mar. 5, 2024), https://perma.cc/XM67-PSP8.

[30] *See* Krsna Avila, Veronica Garcia & Camiel Becker, *Understanding* Matter of Delcarmen-Lara*: The New Meaning of "Departure" Under INA § 212(a)(9)(B)*, Cornell L. Sch. Path2Papers, Sep. 1, 2026, at 7-8, https://perma.cc/TY56-5W5M.

difficult to access consular processing and curtailing consular processing capacity for all applicants, making consular processing far more difficult to obtain.

### III. The May 21, 2026 USCIS Policy Memorandum, PM-602-0199

66. On May 21, 2026, without following notice-and-comment rulemaking procedures, USCIS issued the AOS Policy at issue in this lawsuit, which directs all USCIS employees to view the failure of green card applicants to leave the United States and pursue consular processing, instead of adjustment, as a negative factor that presumptively requires denial of an adjustment application absent "extraordinary" countervailing considerations.

67. Purporting to implement 8 U.S.C. §§ 1103 and 1255, the AOS Policy incorrectly claims that "adjustment of status [is] an 'extraordinary' form of relief dispensing with ordinary immigration procedures," and "that adjustment 'was not designed to supersede the regular consular visa-issuing process or to be granted in non-meritorious cases.'" AOS Policy at 1 (citations omitted).

68. The AOS Policy also contends, without support, that "[w]ith limited exceptions, the statutory scheme suggests that Congress expects [noncitizens] paroled into the United States or admitted into the United States as nonimmigrants to depart rather than pursue adjustment of status" and that "[s]uch [noncitizens] are generally expected to pursue an immigrant visa and admission from outside the United States if they wish to reside permanently in this country." *Id.* at 4. Accordingly, the AOS Policy directs USCIS employees that "[w]hile such [noncitizens] may be otherwise eligible for adjustment of status, their contravention of this expectation and attempt to avoid the ordinary consular immigrant visa process . . . are adverse factors" warranting denial of a green card application. *Id.* at 4–5.

69. The AOS Policy thus requires, contrary to nearly 75 years of agency practice and understanding as well as congressional intent, that "[w]here consular processing is available to [a

noncitizen] based on the immigrant category in which he or she seeks adjustment of status, in determining whether the [noncitizen] warrants a favorable exercise of discretion officers are to consider . . . that adjustment of status is an extraordinary discretionary relief to the regular immigrant visa process and is an act of administrative grace." *Id.* at 5. Accordingly, "as a general matter the discretionary approval of such a request is extraordinary given Congress's intent that [noncitizens] should depart once the purpose for which they sought parole or nonimmigrant admission from DHS has been accomplished." *Id.* at 4. In other words, USCIS employees must treat the failure of a noncitizen paroled into the United States or admitted as a nonimmigrant to depart the country and consular process as an "adverse factor[]" and must deny the application for a green card absent a "showing of *unusual* or even *outstanding equities*." *Id.* at 4–5 (quoting *Matter of Blas*, 15 I. &N. Dec. at 641). And even then, the AOS Policy further directs that "[t]he absence of adverse factors, by itself, does not demonstrate such unusual or outstanding equities." *Id.* at 5.

70. The AOS Policy purports to contemplate "limited exceptions," specifically "nonimmigrant categories with dual intent and immigrant categories where only adjustment of status provides a pathway to permanent resident status." *Id.* at 4.[31] But even then, the AOS Policy subverts the statutory scheme regarding dual-intent nonimmigrants—whose status expressly permits them to pursue permanent residence without violating the terms of their nonimmigrant classification, *see* 8 U.S.C. § 1184(b); 8 C.F.R. §§ 214.2(h)(16), (l)(16)—by directing that "maintaining lawful status in a dual intent nonimmigrant category is not sufficient, on its own, to warrant a favorable exercise of discretion," AOS Policy at 5 n.20, and that even in the absence of adverse factors, the grant of adjustment is "extraordinary" relief. *Id.* at 2.

[31] "Nonimmigrants may have both a short-term intent to leave and a long-term intent to remain permanently. This is known as dual intent." Ira J. Kurzban, *Kurzban's Immigration Law Sourcebook* 2008 (19th ed. 2024).

71. The AOS Policy therefore mandates penalizing virtually all noncitizens applying to adjust status in the United States if they do not leave the country and consular process and directs USCIS officers to treat such failure to depart as an adverse negative factor that can only be overcome in "unusual or even outstanding" circumstances involving countervailing equities. *Id.* at 5.

72. The AOS Policy is a radical departure from controlling statutes, precedent, and policy.

73. The AOS Policy's instructions are already shaping adjustment interviews and adjudications. At their interviews, Ms. Rojas Correa and Ms. Moreno Coto were questioned about why they sought adjustment in the United States rather than permanent residence through consular processing. *See supra* ¶¶ 21-22. The AOS Policy has also affected how applications are decided. USCIS expressly found Ms. Guardado statutorily eligible for adjustment but nevertheless denied her application as a matter of discretion under the AOS Policy's heightened discretionary framework, assigning substantial negative weight to her immigration history, a decades-old arrest, and alleged nondisclosures on prior applications, while discounting favorable equities including her lack of any criminal conviction, tax history, U.S.-citizen family ties, and statutory eligibility for adjustment. *See supra* ¶ 23. At the same time, the AOS Policy requires applicants to demonstrate additional positive equities, such as significant hardship, community contributions, or other benefits to the United States, to overcome the heightened significance given to conduct that does not itself disqualify them from adjustment.

74. The AOS Policy therefore changes both the questions applicants face and the showing they must make in more stringent adjudications. Applicants whom Congress expressly made eligible to seek adjustment in the United States without penalty for doing so can now be required to justify that choice and to overcome significant adverse weight assigned to conduct that

does not itself make them ineligible for adjustment.

75. The consequences of a discretionary denial can be immediate: applicants may lose work authorization and advance parole tied to the pending application and face the choice of departing the United States or remaining under threat of removal proceedings. In some cases, USCIS warns denied applicants that if they do not depart within 33 days, the agency may initiate removal proceedings, which include the prospect of detention for months. That threat has already caused applicants denied under the AOS Policy to leave the country, separating them from their families and disrupting their lives and livelihoods.

**IV. The August 5th Denial Policy Memorandum**

76. On August 5, 2026, also without following notice and comment rulemaking procedures, USCIS issued the Denial Policy at issue in this lawsuit, PA-2026-05, titled "Evidence, Requests for Evidence, and Notices of Intent to Deny," which authorizes USCIS officers to deny pending benefit applications, including adjustment applications, if required initial evidence is missing or the evidence submitted is insufficient to establish eligibility. Denial Policy at 3. The Denial Policy applies not only to newly filed applications but also to applications already pending on August 5, 2026, including adjustment applications filed before USCIS issued the AOS Policy and thus before applicants could have known that their decision to adjust status rather than depart the United States for consular processing would itself be treated as an adverse discretionary factor requiring unusual or outstanding countervailing equities. *Id*.

77. The Denial Policy supersedes prior USCIS guidance, issued June 9, 2021, that instructed USCIS officers generally to issue a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) when the officer determined that additional information or explanation might potentially establish eligibility for the requested immigration benefit. *See* Press Release, *USCIS Updates Policies to Improve Immigration Services* (June 9, 2021), https://perma.cc/UC5L-55Q7.

That policy "ensure[d] that benefit requestors are given an opportunity to correct innocent mistakes and unintentional omissions" and provided that, generally, "a USCIS officer will issue an RFE or NOID when the officer determines additional information or explanation may potentially establish eligibility for an immigration benefit." *Id.* Thus, although regulations already afforded USCIS discretion in specified circumstances to deny a deficient benefit request without first issuing an RFE or NOID, *see* 8 C.F.R. § 103.2(b)(8), the 2021 policy reflected USCIS's considered decision generally to require an opportunity to cure before denial.

78. The Denial Policy asserts that the policy change is necessary because it "will improve [USCIS's] ability to efficiently adjudicate benefit requests by discouraging frivolous, placeholder, or incomplete filings and requiring the requestor to meet his or her burden of proof by submitting complete benefit requests." Denial Policy at 2. The Denial Policy further claims that "[t]he filing of a benefit request without the required initial evidence effectively hampers USCIS' ability to efficiently determine eligibility" and that "[t]his updated policy ensures that benefit requestors are not allowed to either inadvertently or intentionally hamper USCIS' ability to render a decision and as a result gain a potential or actual benefit." *Id.*

79. Based on these claims, the Denial Policy permits USCIS officers to deny benefit applications with no opportunity to cure evidentiary deficiencies, even when the request was filed under materially different agency policies and before USCIS announced a new consideration that may render the applicant's existing record insufficient to warrant a favorable exercise of discretion.

80. For adjustment applicants whose applications were pending on May 21, 2026, the problem is particularly acute. Those applicants filed when the lawful choice to pursue adjustment rather than consular processing was not itself treated as an adverse discretionary factor and therefore had no reason to submit evidence specifically directed toward overcoming that newly announced factor. The AOS Policy now requires officers to assess whether those applicants have

demonstrated unusual or outstanding equities sufficient to offset their "failure" to depart and consular process. AOS Policy at 4–5.

81. Indeed, the Denial Policy does not limit itself to prospective applications, but "is effective immediately and applies to benefit requests *pending* or filed on or after the publication date." Denial Policy at 3 (emphasis added). USCIS thus subjected already-pending applications to a new procedural regime that may deny applicants notice and an opportunity to respond to adverse factors USCIS itself newly imposed. And applicants may see otherwise routine benefit requests denied for failing to make a showing that was not required when they carefully assembled and submitted their applications under the standards then in force.

82. Notwithstanding its decision to apply this new regime immediately to applications filed under the prior policy, USCIS asserts that it "has not identified any significant reliance interests that may have been caused by the previous policies." *Id.* at 3.

83. In reaching that conclusion, USCIS focused on whether benefit requestors could legitimately rely on the prior policy as permission to submit incomplete or deficient applications. But USCIS did not consider the distinct reliance interests of applicants who submitted complete applications under the substantive standards then governing their requests. Adjustment applicants who filed before May 21, 2026, reasonably assembled their evidentiary records when the lawful choice of adjustment over consular processing was not treated as an adverse factor. Nor did USCIS assign heightened adverse weight to overstays or other aspects of immigration history that Congress expressly made non-disqualifying for certain adjustment applicants. USCIS nevertheless made the AOS Policy applicable to their adjudications and then, less than three months later, authorized officers to deny their pending applications without first giving them notice that their existing records were insufficient under the new policy or an opportunity to supplement those records.

84. The Denial Policy, particularly when applied in conjunction with the AOS Policy, is a radical departure from controlling statutes, precedent, and policy. Applied together, the Policies change the rules twice for pending adjustment applicants, first by imposing newly heightened substantive standards after they had already filed and then by withdrawing the process through which they otherwise might have responded to those new adverse considerations before denial.

**V. The AOS and Denial Policies Contravene Congressional Intent**

85. The adjustment framework reflects nearly 75 years of congressional tinkering with requirements, bars, and exceptions for adjustment to LPR status within the United States. Congress has refined the framework to balance concerns of financial hardship, prolonged family separation, and consular workloads (arising from requiring consular processing abroad) with deterring potential abuse of the immigration system (arising from permitting adjustment domestically).

86. Over the course of dozens of amendments to the INA generally and section 1255 specifically, Congress has never expressed a preference that noncitizens present in the United States obtain LPR status through consular processing abroad, let alone categorically required them to do so.

87. Instead, Congress has repeatedly expressed a contrary preference by eliminating requirements to leave the United States prior to seeking adjustment, expanding eligibility for adjustment under section 1255 to permit more noncitizens to obtain LPR status domestically, and increasingly treating adjustment as a central part of the immigration system. *See, e.g.*, H.R. Rep. No. 82-1365, at 1719 (1952) (Adjustment under section 1255(a) "was specifically devised to obviate the need for departure and reentry in the cases of [noncitizens] temporarily in the United States…."). H.R. Conf. Rep. No. 82-2096, at 1755 (1952) (explaining the Congress enacted section 1255(a) "so that [noncitizens] lawfully in the United States in a temporary status may, under

prescribed conditions, have their status adjusted to that of permanent residents without the necessity of leaving the United States."); S. Rep. No. 86–1651 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 3124, 3136-37 ("[Noncitizens] eligible to benefit from [an amendment to section 1255(a)] would also save the expense of journeys [abroad] . . .").

88. Nor has Congress delegated to the Executive Branch authority under the INA to penalize through categorical rules LPR applicants who apply for adjustment of status from within the United States rather than undergo consular processing abroad. Rather, Congress has repeatedly rejected Executive Branch initiatives that undermine its carefully calibrated adjustment scheme.

**a. Pre-Section 1255, the Executive Branch Created its Own "Adjustment" Process to Circumvent Congress**

89. In the early 1930s, most noncitizens present in the United States who were not LPRs had to undergo consular processing abroad to obtain such status.[32] The Executive Branch considered the inability of a noncitizen present in the United States and eligible for an immigrant visa to obtain permanent residency without returning to their home country a "cruel and unnecessary hardship[],"[33] and therefore lobbied Congress and the public to "further humanize the immigration system."[34] But restrictionists in Congress thrice defeated proposed reforms.[35]

---

[32] Immigration Act of 1924 §§ 2(a), 13(a), Pub. L. No. 68-139, 43 Stat. 153, 153, 161 (1924); *see also* Act to Supplement the Naturalization Laws, and for Other Purposes §§ 1-3, Pub. L. No. 70-962, 45 Stat. 1512, 1512-13 (1929) (permitting certain noncitizens to obtain LPR status if they had resided continuously in the United States since June 3, 1921).

[33] U.S. Dep't of Labor, Immigr. & Naturalization Servs., Memorandum of Commissioner of Immigration and Naturalization to the Committee on Immigration of the Senate and Committee on Immigration and Naturalization of the House of Representatives Relative to Certain Proposed Changes in the Immigration Law 1 (1934), https://perma.cc/7Q55-LCD7.

[34] William J. Camarda, *Preexamination and its Alternatives: The Provision and Experience of Discretionary Relief for Certain Unauthorized Immigrants to the U.S., 1935-1959*, at 38 (May 2021) [hereinafter "Camarda"], https://perma.cc/735B-HBK3 (recapping these efforts).

[35] 78 Cong. Rec. 11782-91 (1934) (rejecting a reform bill by a count of 92 yeas, 185 nays, and 152 abstentions after statements by Reps. Martin Dies Jr. and Louis T. McFaddden); *see also* Camarda, *supra* note 34, at 50 (recounting "extreme restrictionist" Sen. Robert Rice Reynolds's successful filibuster of two other bills).

90. Stymied by Congress, the Executive Branch "developed an administrative procedure known as preexamination" in 1935 that enabled a noncitizen temporarily in the United States to obtain LPR status without returning to their native country for consular processing.[36] Preexamination was a "two-step procedure" that exploited "an obscure clause of the Immigration Act of 1917" to allow a noncitizen present in the United States and eligible for an immigrant visa to obtain permanent residency without returning to their home country for consular processing.[37] First, a noncitizen "was inspected preliminarily by an immigration officer and medically examined within the United States to determine whether he would be admissible to the United States if he were in possession of an immigrant visa."[38] Then, "he was furnished with documents to enable him to proceed to a designated United States consulate in Canada on a specified date to apply for a visa,"[39] with "written assurance" to the Canadian authorities that the United States would permit the noncitizen's immediate reentry even if the consular officer denied them an immigrant visa.[40] The noncitizen "proceeded to that consulate, obtained the visa if the consular officer found him eligible therefor after personal interview, and then presented the visa at a port of entry to the United States where he was again inspected."[41]

91. Thousands of noncitizens benefited from preexamination annually between 1935

---

[36] Immigr. & Naturalization Serv., U.S. Dep't of Just., *Report of the Select Commission on Western Hemisphere Immigration* 139 (1968) [hereinafter "Select Commission Report"], https://perma.cc/3VZH-TD36; *see also Jain v. INS*, 612 F.2d 683, 686 (2d Cir. 1979) (citing 2 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 7.3a).
[37] Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of America* 84–85 (2004).
[38] Select Commission Report, *supra* note 36, at 139–40.
[39] *Id.* at 140.
[40] Ngai, *supra* note 37, at 85.
[41] Select Commission Report, *supra* note 36, at 140. *See generally* New Regulations Governing Preexamination of Aliens Within the United States, 6 Fed. Reg. 65, 65–67 (1941), https://www.loc.gov/resource/fedreg.fr006003/?pdfPage=1 (codifying the procedure as Part 17 of Title 8, Code of Federal Regulations).

and 1952.[42] But the program "attracted fierce opposition from restrictionists in Congress" as it grew.[43]

**b. Congress Enacted and Amended Section 1255 to End Preexamination and Regain Control over the Permanent Residency Process**

92. In 1952, Congress enacted 8 U.S.C. § 1255 to end preexamination and reassert its control over the processes for obtaining LPR status.[44] It did so by permitting certain noncitizens "lawfully in the United States in a temporary status [to], under prescribed conditions, have their status adjusted to that of permanent residents without the necessity of leaving the United States."[45]

93. Even so, under the 1952 Act, entry into the United States as a nonimmigrant with a preconceived intent to remain—that is "a preconceived intent to remain permanently at the time of entry as a nonimmigrant"[46]—was a statutory bar to adjustment of status. Section 1255 originally

---

[42] *See* S. Rep. No. 81-1515, pt. I, ch. vi, § F, at 605 (1950), https://tinyurl.com/mtywh7ah (45,000 preexamination adjudications between 1935 and 1950); PRESIDENT'S COMM'N ON IMMIGRATION AND NATURALIZATION 210 (1951) (Truman Report), https://perma.cc/EA3C-SQWN (1,357 adjudications in 1951, 1201 of which were approvals); S. Rep. No. 85-2133 (1958) (7,000 approvals in 1952).

[43] Camarda, *supra* note 34, at 61; *see also id.* at 62–63, 95 (discussing an "attempt to ban preexamination by defunding it" and criticism that preexamination "advantaged lawbreakers over honest migrants, undercutting respect for the law" and was "one of the greatest executive abuses of our immigration laws in the history of this country"); S. Rep. No. 81-1515, pt. I, ch. vi, § F, at 605-06, 611 (summarizing beliefs that "the preexamination procedure is of doubtful legality" and "places a premium on illegal entry"); *id.* at pt. I, ch. vi, § J, at 611 (recommending "that preexamination be abolished").

[44] *See* H.R. Rep. No. 82-2096, at 128 (1952) (criticizing preexamination for being "cumbersome" and "obsolete" and "contain[ing] certain loopholes for the admission for permanent residence of undesirable [noncitizens]"); S. Rep. No. 82-1137, at 26 (1952) ("The adoption of [Section 245] will remove the necessity for the administrative practice of preexamination . . . ."); 98 Congr. Rec. 7017 (1952) (explaining that the conference committee "adopted the position . . . that the practice of preexamination should be discontinued").

[45] H.R. Conf. Rep. 82-2096 at 1755 (1952); *see also* H.R. Rep. No. 82-1365, at 1719 (1952) ("This procedure was specifically devised to obviate the need for departure and reentry in the cases of [noncitizens] temporarily in the United States . . ."); 4 Charles Gordon et al., *Immigration Law and Procedure* § 51.01[1][b] 51-6–51-13 (rev. ed. 2004) (discussing travel hardship problems which gave rise to both the former "preexamination" procedure and adjustment of status which replaced it).

[46] *Ibrahim*, 18 I. & N. Dec. at 56.

provided that eligibility for an adjustment of status was limited to "bona fide nonimmigrants," or, as restated in the same provision, those "[noncitizens] who entered the United States in good faith as nonimmigrants."[47]

94. This first attempt by Congress to reassert control over LPR processes through adjustment of status failed since section 1255 barred "many admissible [noncitizens] for whom visas were immediately available" from "adjust[ing] their status within the United States," including categorical bars to those not deemed "bona fide nonimmigrant[s]" or failed "to maintain the nonimmigrant status" (hereinafter "unlawful presence bar").[48] Fewer than 4,000 noncitizens adjusted their status to permanent residency annually after section 1255's passage.[49]

95. Section 1255's limited utility prompted the INS to revive preexamination.[50] In response, Congress "relaxed" section 1255's restrictions on adjustment in 1958,[51] after "close scrutiny" of the statutory scheme in a renewed effort to render preexamination "unnecessary."[52] It eliminated the unlawful presence and western hemisphere bars as well as the one-year immediate relative residency requirement and a provision "terminat[ing] nonimmigrant status" upon

---

[47] *See* 8 U.S.C. § 245 (1952) (current version at § 1255), Immigration and Nationality Act, Pub.L. No. 85–700, § 1, 72 Stat. 699 (1958).

[48] Select Commission Report, *supra* note 36, at 140–41; *see also* INA §§ 101(a)(27)(C), 245(a), Pub. L. No. 82- 414, 66 Stat. 163, 217 (1952) (barring noncitizens who were unlawfully present (i.e., did not "maintain" "bona fide nonimmigrant" status); natives of a country in the western hemisphere who were not the child or spouse of a U.S. citizen (hereinafter "western hemisphere bar"); or the child or spouse of a U.S. citizen seeking adjustment based on that relationship without "hav[ing] been in the United States for at least one year" (hereinafter "one-year immediate relative residency requirement").

[49] *See* Abraham D. Sofaer, *The Change-of-Status Adjudication: A Case Study of the Informal Agency Process*, 1 J. Legal Stud. 349, 353 (1972), https://perma.cc/97UG-4AUY (3,702 in 1956); Select Commission Report, *supra* note 36, at 152 (3,991 people in 1958).

[50] Miscellaneous Amendments to Chapter, 20 Fed. Reg. 3495, 3496 (May 19, 1955); *see also* Camarda, *supra* note 34, at 132 (3,084 preexamination approvals in 1957 and 4,822 approvals in 1958).

[51] Charles C. Foster, *The Logic of Adjustment of Status to Permanent Residency*, 24 S. Tex. L.J. 37, 40–41 (1983), https://perma.cc/67CP-VYRE.

[52] *see* S. Rep. No. 85-2133 at 2 (1958).

application for adjustment.[53]

96. Two years later, in 1960, Congress "made it even easier to apply for an adjustment of status."[54] It extended adjustment to noncitizens "paroled into the United States"—i.e., "[noncitizens] applying for admission to the United States" who are allowed to come "into the United States temporarily . . . for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)—and dropped the requirement that an immigrant visa be available at the time of application (in addition to the time of approval).

97. In addition, as part of the 1960 amendments, Congress eliminated the "bona fide immigrant" bar, eliminating preconceived intent as a blanket ineligibility ground.[55]

98. These amendments succeeded the INS phased out preexamination in 1959,[56] while the number of noncitizens who adjusted their status to permanent residency jumped from 3,991 in 1958 to 9,796 in 1959, doubled to 19,779 in 1963, and reached 29,556 people by 1966 and 41,528 people in 1970.[57]

**c. Over the Next 30 Years, Congress Repeatedly Adjusted Section 1255 to Respond to Executive Branch Intervention and Balance the Risk of Immigration Abuses Against Hardship**

99. In 1965, Congress revived the western hemisphere bar to remedy the "recurring problem in cases of natives of Central and South America who come to the United States as nonimmigrant visitors and promptly seek permanent resident status under section 245 [8 U.S.C. §

---

[53] An Act to Amend Section 245 of the Immigration and Nationality Act, and for Other Purposes § 1, Pub. L. 85-700, 72 Stat. 699, 699 (Aug. 21, 1958).

[54] Tamara K. Fogg, Comment, *Adjustment of Status Under Section 245 of the Immigration and Nationality Act*, 20 San Diego L. Rev. 165, 172 (1982), https://perma.cc/Z5TU-QUUA.

[55] Pub. L. No. 86-648, 74 Stat. 505. *See Ibrahim*, 18 I & N Dec. at 57 ("Entry into the United States with a preconceived intention to remain was once a statutory bar to adjustment of status. Congress eliminated that bar in 1960"); *Jain v. Immigration and Naturalization Service*, 612 F.2d 683, 687-89 (2nd Cir. 1979) (similar).

[56] Camarda, *supra* note 34, at 138–39.

[57] Select Commission Report, *supra* note 36, at 152; *see also* Sofaer*, supra* note 49, at 353.

1255].”[58]

100. A decade later in 1976, Congress removed this bar (for a second time) to mitigate the “many hardships” and “unnecessary expense” of western hemisphere natives “return[ing] to their country of origin to obtain an immigrant visa from a U.S. consular official,”[59] and “made it substantially easier to apply for adjustment”[60] by making eligibility contingent on the availability of an immigrant visa at the time an application is filed, rather than approved.[61] Congress also added adjustment bars for noncitizens (other than immediate relatives) who worked unlawfully prior to filing an application for adjustment of status to “deter [them] from violating the conditions of their admission by obtaining unauthorized employment” (hereinafter “unlawful employment bar”) and noncitizens “admitted in transit without visa” to “confirm existing administrative procedures.”[62]

101. In 1981, Congress created an exception to the unauthorized employment bar for certain special immigrant physicians since they “ha[d] served the health care needs of this country for a substantial period of time and have developed close ties with the communities in which they reside.”[63]

102. In 1986, Congress revived an unlawful presence bar for noncitizens—other than immediate relatives and special immigrant physicians—who lack lawful status or had failed to

---

[58] S. Rep. No. 89-748, 1965 U.S.C.C.A.N. 3328, 3343 (1965); H.R. Rep. No. 89-745, at 22 (1965); *see also* Hart-Celler Act § 13, Pub. L. 89-236, 79 Stat. 911, 918-19 (1965) (amending 8 U.S.C. § 1255(c)).

[59] H.R. Rep. No. 94-1553, at 12 (1976); *see also id.* at 4 (finding that the bar “does not appear to serve any useful purpose commensurate with the hardship and inconvenience it causes natives of Western Hemisphere countries”); Immigration and Nationality Act Amendments of 1976 § 6, Pub. L. 94-571, 90 Stat. 2703, 2705-06 (1976) (amending 8 U.S.C. § 1255(c)).

[60] Fogg, *supra* note 54, at 173.

[61] Immigration and Nationality Act Amendments of 1976 § 6, Pub. L. 94-571, 90 Stat. at 2705-06 (codified as 8 U.S.C. § 1255(a)(3)).

[62] H.R. Rep. No. 94-1553, at 12; *see also* Immigration and Nationality Act Amendments of 1976 § 6, Pub. L. 94-571, 90 Stat. at 2705-06 (codified as 8 U.S.C. § 1255(c)(2), (3)).

[63] H.R. No. 97-264, at 17, 23 (1981); *see also* Immigration and Nationality Act Amendments of 1981 § 5(d)(2), Pub. L. 97-116, 95 Stat. 1611, 1614 (1981) (codified as 8 U.S.C. § 1255(c)(2)).

maintain such status continuously since entry to the United States (other than through no fault of their own or for technical reasons) "to make adjustment of status a much less frequently used method of obtaining permanent resident status in the United States."[64] Congress also added an adjustment bar for noncitizens (other than immediate relatives) admitted to the United States through its newly-created visa waiver program.[65]

103. A few months later, Congress added bars to adjustment for noncitizens admitted on a fiancé visa or as conditional permanent residents[66] and those seeking permanent residence based on marriage executed during deportation proceedings to curb the use of "a fraudulent marriage" to "side-step … immigration law."[67]

104. Meanwhile, in or around 1978, the Executive Branch had revived preexamination "in substance though not in name . . . under the guise of 'Stateside Criteria.'"[68] Leveraging statutory provisions for voluntary departure, the INS permitted certain noncitizens statutorily ineligible for adjustment of status—particularly those with "a close relationship (parent, spouse, child, or adult unmarried son or daughter) to a United States citizen or permanent resident"[69]—to remain in the United States with employment authorization "until the American consul is ready to

---

[64] S. Rep. No. 99-132, at 31 (1985); *see also* Immigration Reform and Control Act of 1986, Title I, § 117, Pub. L. 99-603, 100 Stat. 3384, 3438 (1986) (codified as 8 U.S.C. § 1255(c)(2)).

[65] Immigration Reform and Control Act of 1986 § 313(c), 100 Stat. at 3438-39 (codified as 8 U.S.C. § 1255(c)(5)); *see also* S. Rep. No. 99-132, at 53.

[66] Fiancés and conditional permanent residents remained eligible to apply for adjustment through a separate process. *Se*e Immigration Marriage Fraud Amendments of 1986 § 2(a), Pub. L. 99-639, 100 Stat. at 3537-38 (codified in 8 U.S.C. 1186a).

[67] H.R. Rep. No.99-906, 1986 U.S.C.C.A.N. 5978, 5978, 5983 (1986); *see also* Immigration Marriage Fraud Amendments of 1986 §§ 2(e), 3(b), 5(a), Pub. L. 99-639, 100 Stat. 3537, 3542, 3543 (1986) (codified as 8 U.S.C. § 1255(d), (e)).

[68] Foster, *supra* note 51, at 38; *see also* Termination of Stateside Criteria Program, 52 Fed. Reg. 19442, 19442 (May 22, 1987).

[69] 52 Fed. Reg. at 19443.

issue an immigrant visa."[70] When the consul was ready to adjudicate that visa application, DOS permitted these noncitizens to undergo consular processing at designated posts in Canada or Mexico rather than in their home countries with "guarantee[d]" reentrance to the United States "following the immigrant visa interview, even if the visa application [was] refused."[71] Tens of thousands of noncitizens benefited from the Stateside Criteria Program through 1986.[72]

105. Like preexamination before it, the Stateside Criteria Program drew the ire of Congress.[73] So, in 1987, DOS terminated the program.[74]

**d. Again Demonstrating Its Interest in and Authority to Balance Risk of Fraud Against Hardship, Between 1990 and 2000 Congress Added Adjustment Bars and Exceptions to Those Bars**

106. In 1990, Congress carved out a "bona fide" marriage exception to the bar for adjustment based on marriage during deportation proceedings to preserve family unity.[75]

107. In 1991, Congress exempted certain noncitizen members of the U.S. Armed Forces from the unlawful employment bar and deemed them "paroled into the United States" to facilitate

---

[70] Voluntary Departure Prior to Commencement of Hearing, 43 Fed. Reg. 29526, 29528 (1978); *see also* Foster, *supra* note 51, at 38.
[71] 52 Fed. Reg. at 19442; *see also* Foster, *supra* note 51, at 37–38.
[72] Stateside Criteria Program, 52 Fed. Reg. 45272, 45272-73 (Nov. 25, 1987) (29,000 in FY1986 alone).
[73] S. Rep. No. 99-132, at 31 (1985) (admonishing "the administration" to "not respond to the new limitations on adjustment of status by making special arrangements enabling aliens who are not nationals of countries which border on the United States to obtain immigrant visas in such countries").
[74] 52 Fed. Reg. at 45273 (1987); *see also* 52 Fed. Reg. at 19442 (criticizing it as "an anomaly" and "a 'back door' into the United States in direct contradiction to the goals of [recent] legislation").
[75] Immigration Act of 1990, Pub. L. 101-649 § 702(a), 104 Stat. 4994, 5086 (1990) (codified as 8 U.S.C. § 1255(e)(3)); *see also* H.R. Rep. No.101-723, pt. 1, at 6731-32 (1990) (finding that "[d]eportation proceedings can last many years, for reasons not under the [noncitizen]'s control" and that "[d]uring the pendency of the process, it is not unusual for [a noncitizen] defendant, who is frequently young and single, to meet someone, develop a relationship, and even have children"); H.R. Conf. Rep. 101-955, at 6793 (1990) (adopting the "'bona fide marriage' exception" during the conference process).

their adjustment.[76]

108. In 1994, Congress extended adjustment to noncitizens who either entered without inspection or were subject to certain bars (including those for unlawful employment or unlawful status) if they paid "an additional fee" after concluding that such barriers to adjustment "had not provided the intended deterrent effect" of "dissuad[ing] [noncitizens] from circumventing normal visa requirements" and instead had "merely create[d] consular workload overseas."[77]

109. In 1996, Congress added an adjustment bar for noncitizens engaged in terrorism.[78] Later that year, Congress added two more unlawful presence and unlawful employment bars to "increas[e] the disincentives for … visa overstay."[79]

110. But in 1997, Congress created an exception to these two bars—as well as the unlawful employment and unlawful presence bars—for noncitizens seeking "employment-based"

---

[76] H.R. Rep. No.102-195, at 991; *see also* Armed Forces Immigration Adjustment Act of 1991 § 2(c), Pub. L. 102-110, 105 Stat. 555, 556 (1991) (codified as 8 U.S.C. § 1255(c)(2), (g)).

[77] S. Rep. No. 103-309, at 134 (1994); *see also* FY1995 Appropriations Commerce, Justice, and State Appropriations Act, Title V, § 506(b), Pub. L. 103-317, 108 Stat. 1724, 1765 (1994) (codified as 8 U.S.C. § 1255(i)). Initially, this extension was temporary. H.R. Conf. Rep. No. 103-708, at 84 (1994) (sunsetting the extension at the end of fiscal year 1997). But, Congress later made it permanent, first for noncitizens who started the adjustment process prior to January 14, 1998, FY1998 Commerce, Justice, State, Judiciary and Related Agencies Appropriations Act, Title I, § 111(a), (b), Pub. L. 105-119, 111 Stat. 2440, 2458 (1997) (amending 8 U.S.C. § 1255(i)), and subsequently for noncitizens who started that process on or before April 30, 2001, and were present in the United States on December 21, 2020, Life Act Amendments of 2000 § 1502(a), Pub. L. No. 106-554, 114 Stat. 2763A-324, 2763A-324 (2000) (amending 8 U.S.C. § 1255(i)), despite "questions hav[ing] been raised regarding [the extension's] possible abuse," S. Rep. No. 105-48, at 32 (1997).

[78] Antiterrorism and Effective Death Penalty Act of 1996, Title IV, § 413(d), Pub. L. 104-132, 110 Stat. 1269 (1996) (codified as 8 U.S.C. § 1255(c)(6)); *see also* H.R. No. 104-383, at 99 (1995) (describing AEDPA's revisions to adjustment); Illegal Immigration Reform & Immigrant Responsibility Act of 1996 ("IIRIA"), Div. C, Title III, § 308(g)(10)(B), Pub. L. 104-208, 110 Stat. 3009, 3009-625 (1996) (updating the cross-reference to account for newly added provisions).

[79] S. Rep. No. 104-249, at 2, 20 (1996). One barred adjustment for any noncitizen "who has been employed unlawfully within the U.S. at any time or otherwise violated the terms of a nonimmigrant vias" and the other barred "employment-based adjustment" for a noncitizen "not currently in lawful nonimmigrant status." *Id.* at 20; *see also* IIRIRA, Div. C, Title III, § 375, Pub. L. 104-208, 110 Stat. 3009, 3009-648 (1996) (codified as 8 U.S.C. § 1255(c)(7), (8)).

adjustment who had lawful status and had "lapsed into illegal status for less than six months."[80]

111. In 2000, Congress added an exception to most adjustment bars—including those for unlawful employment and unlawful presence—for victims of domestic violence so they could "obtain status as lawful permanent resident[s] in the United States rather than having to go abroad to get a visa."[81]

112. Finally, in 2022, Congress provided that certain noncitizen investors meet section 1255(a)'s visa immediate availability requirement if approval of their pending or concurrently filed petition for such a classification "would make a visa immediately available to the[m]."[82]

### e. Other Amendments to the INA Confirm that Adjustment Is an Ordinary Feature of the INA, Not an Extraordinary Exception to Consular Processing

113. Numerous amendments to the INA since 1952 reflect a clear Congressional understanding that adjustment of status within the United States is the norm, and not an exception to consular processing.

114. For example, in the family-visa category, K-visa entrants are admitted for the very purpose of marrying a U.S.-citizen petitioner and then timely adjusting status in the United States. 8 U.S.C. §§ 1101(a)(15)(K), 1255(d).

115. And in the employment-visa category, Congress provided that H-1B (specialty occupation) and L-1 (intracompany transferee) nonimmigrants may not be denied these

---

[80] H.R. Conf. Rep. 105-405, at 130 (1997); *see also* FY1998 Commerce, Justice, State, Judiciary and Related Agencies Appropriations Act, Title I, § 111(c), Pub. L. 105-119, 111 Stat. at 2457-58 (codified as 8 U.S.C. § 1255(k)).

[81] H.R. Conf. Rep. No. 106-939, at 113 (2000); *see also* Victims of Trafficking and Violence Protection Act of 2000 § 1506(a), Pub. L. 106-386, 114 Stat. 1464, 1527 (2000) (codified in 8 U.S.C. § 1255(a), (c)); Violence Against Women and Department of Justice Reauthorization Act – Technical Corrections § 6(f), Pub. L. 109-271, 120 Stat. 750, 763 (2006) (amending 8 U.S.C. § 1255(a), (c) to use a term of art in lieu of cross-references).

[82] Consolidated Appropriations Act of 2022 § 102(d), Pub. L. 117-103, Div. BB, § 102(d), 136 Stat. 49, 1075 (2022) (codified as 8 U.S.C. § 1255(n)).

classifications merely because they have sought permanent residence. Immigration Act of 1990, Pub. L. 101-649 § 205(b), 104 Stat. at 5020 (codified as 8 U.S.C. § 1184(h)). Congress also enacted transitional protection for H-1B workers stuck in the employment-based green card backlog.[83] The accompanying Senate Report noted that the provision "enables these individuals to remain in H-1B status until they are able to receive an immigrant visa and adjust their status within the United States, thus limiting the disruption to American businesses."[84] In 2000, Congress also provided flexibility for adjustment applicants in certain employment-based immigrant visa categories (8 U.S.C. § 1153(b)(1)(B)–(C), (b)(2)–(3)), so that they could maintain their eligibility to become LPRs while faced with backlogs in visa availability, if they met certain conditions when changing jobs or employers. 8 U.S.C. § 1154(j).

## VI. The AOS and Denial Policies Harm Plaintiffs, Their Members, and the Public

116. Plaintiffs are individuals and organizations that represent and serve individuals subject to and harmed by these unlawful and inhumane policies.

117. Some Plaintiffs are individuals who have or would be applying for adjustment of status and are suffering and will continue to suffer harms stemming from the Policies.

118. Some Plaintiffs are associations whose members have, will, or would submit AOS applications. The Policies' harms to Plaintiffs' members include the pain of family separation; the inability to complete academic and professional degrees and the fear of the resulting loss of jobs, income, and health insurance that supports them and their families; and the Hobbesian choice to remain in the U.S. and possibly have their AOS application denied or leave the U.S. to return to a foreign country with no support or family for years or even indefinitely.

---

[83] American Competitiveness in the Twenty-First Century Act of 2000 (AC21), Pub. L. No. 106-313, 114 Stat. 1251 (2000).

[84] Pub. L. No. 106-313, 114 Stat. 1251 (2000); S. Rept. No. 106-260, at 23 (2000), https://www.congress.gov/committee-report/106th-congress/senate-report/260/1.

119. One Plaintiff is an organization that serves immigrant communities whose core functions are impeded by these policies. Americans for Immigrant Justice (AI Justice) provides free legal services to low-income immigrants through its Family Defense Program, Domestic Violence and Human Trafficking Program (also known as LUCHA), Children's Legal Program, Detention Program, and Pro Bono Program. Among other services, these programs advise and represent noncitizens seeking adjustment of status to lawful permanent residence. AI Justice handles adjustment matters arising through family-based petitions, the Cuban Adjustment Act, asylum, the Violence Against Women Act, and Special Immigrant Juvenile status. Providing effective representation in these matters is a core part of AI Justice's ordinary operations.

120. The AOS Policy directly interferes with AI Justice's provision of legal services and forces the organization to expend substantially more staff time and resources on its existing and prospective adjustment representations. To address the AOS Policy's expanded discretionary framework, AI Justice staff must, for every pending and new adjustment of status matter, conduct more extensive client interviews; investigate and document favorable equities; obtain and review additional records; reconcile new submissions with the full case file and the client's immigration history; prepare clients for new lines of questioning at USCIS interviews; develop additional legal arguments; and subject the resulting submissions to additional supervisory and quality-control review. AI Justice must undertake this work even for applicants whom Congress has exempted from certain adjustment bars and for applicants whose statutory pathways make consular processing legally or practically unavailable.

121. AI Justice provides these services without charge to clients who generally cannot afford private counsel. It cannot recoup the additional cost imposed by the AOS Policy by increasing client fees. Because AI Justice operates with limited staff and funding, the additional time required for each adjustment matter necessarily reduces the time available for other existing

matters and decreases the number of new clients AI Justice can accept and serve. The AOS Policy directly and perceptibly impairs AI Justice's core legal-services operations.

**a. Service Employees International Union**

122. Plaintiff SEIU has millions of members, over 25% of whom identify as immigrants. A significant number of SEIU members are foreign-born U.S. citizens, lawful permanent residents, and immigrants authorized to work in the United States. Many members have applied for or plan to seek adjustment and/or have immediate relatives who have gone through or are eligible to go through the adjustment process. SEIU's members have been severely impacted by the Policies.

123. The AOS Policy puts SEIU members' adjustment applications at greater risk of denial by directing USCIS to weigh their decision to seek permanent residence from within the United States against them. For members with pending applications, the Denial Policy compounds that harm by permitting USCIS to deny their applications without first giving them notice that their existing evidence is insufficient under the new discretionary framework or an opportunity to supplement the record.

124. SEIU Member A is a 4th year resident and attending physician from China who is trained in Emergency Medicine. SEIU Member A intends to apply for adjustment based on an approved employment-based immigrant visa petition in the EB-2 category, together with an approved National Interest Waiver. SEIU Member A came to the United States in 2015 with a student visa to attend college. After receiving their bachelor's degree, SEIU Member A attended medical school in the US and was subsequently admitted to a prestigious internship and residency program. As a 4th year resident, SEIU Member A supervises interns and residents, and cares for as many as 400 patients per month. SEIU Member A intends to continue their teaching and research by applying for a medical education fellowship.

125. SEIU Member A fears that if the AOS Policy prevents them from adjusting status

in the United States and requires them to pursue permanent residence through consular processing, a prolonged absence from the United States would interrupt the clinical work that they cannot perform from abroad. Member A could no longer treat their patients or perform their in-person supervisory responsibilities, and an extended interruption could delay or disrupt their ongoing medical training, including fellowship training, and interfere with their teaching and research. Their hospital or other medical institution would also have to cover clinical and supervisory responsibilities that Member A currently performs.

126. SEIU Member A will also suffer tremendous personal harm, as they will be separated from their partner, colleagues, friends, and profession they worked hard to attain, and instead be forced to return to a country where they have no support system and in which they have not lived in for more than a decade.

127. SEIU Member B is a Brazilian physician and 2nd year resident with a pending application for adjustment of status. SEIU Member B entered the United Stated to pursue a residency in anesthesiology at a large prestigious hospital in the United States. Their EB-2 immigrant visa petition, based on exceptional ability and accompanied by a National Interest Waiver, was approved in 2025. SEIU Member B conducts crucial research and provides anesthesia to over 1,100 patients per year. Once SEIU Member B completes their residency, they will apply for an anesthesiology fellowship.

128. SEIU Member B will face the disastrous and shortsighted consequences of the AOS Policy. If SEIU Member B is unable to be granted permanent residency through adjustment of status, they would be required to leave the United States to pursue consular processing while in the middle of their medical training. They could not continue the in-person clinical work and patient care required by their anesthesiology residency while abroad. A prolonged absence would interrupt their residency and could delay its completion, which in turn could interfere with their

planned transition to an anesthesiology fellowship. Their hospital would also have to cover the patient-care responsibilities and clinical work SEIU Member B could no longer perform while outside the United States.

129. Additionally, Brazil is one of the 75 countries subject to the State Department's January 2026 suspension of immigrant visa issuance. *See infra* ¶ 60. Although a federal court vacated that policy in August, meaningful resumption of processing has thus far been extremely limited. More than 43,000 applications were refused solely under the policy, and the State Department has provided no fixed timeline for completing reconsideration of those cases. Requiring SEIU Member B to leave the United States and pursue consular processing against that backdrop could leave them unable to return to the United States for an indeterminate period. That could jeopardize their residency and employment, while separating them from the professional and personal life they have built here.

130. SEIU Member C is a citizen of Nepal, a physician, and a 2nd year resident in pediatrics whose U.S. citizen spouse filed a family-based immigrant visa petition on their behalf. The petition was approved, and SEIU Member C filed an application for adjustment, which remains pending. After completing medical school in Nepal, SEIU Member C was admitted to a pediatric residency program in the United States and has worked in a hospital in the United States since. SEIU Member C treats children of all ages from newborns needing ventilator support and surgery for heart disease in the Neonatal Intensive Care Unit to adolescents. SEIU Member C treats 10-15 patients per day.

131. SEIU Member C is afraid that the AOS Policy will force them to depart the United States to pursue an immigrant visa through consular processing. They are deeply concerned that their medical career will be harmed if required to leave the U.S. SEIU Member C could not continue the in-person clinical work and patient care required by their pediatric residency while

abroad. A prolonged absence would interrupt their residency, cause them to miss clinical training and patient-care responsibilities, and could delay completion of the program. A lengthy interruption could also jeopardize their ability to complete their training in their current residency program. SEIU Member C has devoted approximately a decade to the education and training necessary to become a physician serving communities in the U.S., and an extended interruption at this stage would significantly disrupt that career path.

132. Moreover, Nepal is one of the 75 countries included in the Trump-Vance Administration's January 2026 suspension of immigrant visa issuance. *See infra* ¶ 60. Requiring SEIU Member C to pursue consular processing could strand them abroad and derail their medical training and career.

133. SEIU Member C also faces family separation as a result of the AOS Policy. SEIU Member C's spouse, a nurse, and extended family are all either U.S. citizens or lawful permanent residents of the United States. Without family support, life in Nepal, which is already challenging due to environmental disasters, civil unrest, and extreme poverty, would be particularly difficult for SEIU Member C.

134. SEIU Member D is a physician and a citizen of Cameroon who will be applying for adjustment of status based on marriage to a U.S. citizen. After completing medical school in Cameroon, they applied for and matched with a Family Medicine residency program in the U.S. A 3rd year resident at a large community hospital, SEIU Member D treats a wide range of patients, from newborns to older adults, suffering from diabetes, heart and kidney disease, and other health conditions.

135. SEIU Member D's family in the U.S. includes U.S. citizens and lawful permanent residents. Their spouse, a nurse in a surgery unit, is a U.S. citizen, and one of their brothers is a Captain in the U.S. Army.

136. SEIU Member D, a member of the Anglophone minority in Cameroon, fears returning there to pursue consular processing should the Policy make it difficult for them to adjust status in the U.S. Cameroon's violent conflict between the government and separatists from the English-speaking minority has resulted in a humanitarian crisis and the deaths of thousands. They do not feel safe remaining in Cameroon for any period of time.

137. SEIU Member D is committed to completing their residency, the culmination of over a decade of education and training. If they were required to remain abroad for an extended period to undergo consular processing, they could no longer treat patients in the hospital and outpatient clinics or continue their Family Medicine training. A prolonged absence could delay completion of the residency and set back the medical career they have spent more than a decade building. Their hospital would also have to redistribute Member D's inpatient and outpatient patient-care responsibilities among other physicians, further straining an already short-staffed primary-care workforce.

**b. Service Employees International Union, Local 32BJ (32BJ SEIU)**

138. Plaintiff 32BJ SEIU has over 185,000 members, with approximately 22,000 members in Massachusetts. Many 32BJ SEIU members have been or will be severely harmed by the Policies. The Policies prevent many members from becoming LPRs through adjustment of status. Instead, because of the Policies, 32BJ SEIU's members will be forced to leave the US for extended periods of time to seek consular processing and face economic destitution and loss of their jobs, homes, and family's health insurance.

139. 32BJ SEIU Member A is from Honduras and entered the United States more than 37 years ago. 32BJ SEIU Member A was granted Temporary Protected Status and work authorization in 1999. She was granted advance parole on her TPS status in 2013. 32BJ SEIU Member A has two U.S. citizen daughters, one of whom lives with her. In 2025, 32BJ SEIU

Member A submitted an adjustment application along with a family-based visa petition submitted on her behalf by one of her daughters. Her AOS application is still pending, while she has a valid work permit based on that pending application.

140. 32BJ SEIU Member A fears the prospect of having to return to Honduras to consular process because of the widespread violence and cartel activity in Honduras and the harsh economic conditions that would make it difficult for her to find employment. She is also concerned for her daughters if she is forced to leave the country.

141. 32BJ SEIU Member B is a Honduran citizen who entered the United States 29 years ago. In 1999, he was granted TPS and work authorization and regularly extended both until the recent termination of Honduras's TPS designation. In 2025, 32BJ SEIU Member B applied for adjustment of status based on a visa petition filed by his son, a U.S. citizen.

142. 32BJ SEIU Member B has worked in the maintenance department of a university for the last 14 years. His wife and children depend on his employer-funded health insurance for all their medical needs. 32BJ SEIU Member B lives with and financially supports his wife and five U.S. citizen children. Four of his children are under 11 years old, and one is 21 years old. A prolonged stay in Honduras for consular processing will cause 32BJ Member B to lose his job, tear apart his family, rip his family from healthcare, result in the loss of his home, and place his family at risk of food insecurity. Due to the poor economic conditions in Honduras it will be difficult for 32BJ SEIU Member B to find employment in Honduras to support his family.

**c. Service Employees International Union, Local 509 ("SEIU Local 509")**

143. Plaintiff SEIU Local 509 is a local affiliate of SEIU International, with over 20,000 members. SEIU Local 509 represents human service workers and educators throughout Massachusetts. SEIU Local 509 has a large immigrant membership which includes members who are authorized to work and are applying for adjustment of status to obtain lawful permanent

residence. The AOS and Denial Policies severely harm many SEIU Local 509 members by preventing them from becoming LPRs through the adjustment process. Absent the opportunity to adjust status from within the United States, SEIU Local 509 members seeking to become LPRs must leave their homes and families in the United States and face the interruption or loss of their careers and studies.

144. SEIU Local 509 Member A is a citizen of Haiti who has worked as a direct care provider for a human services agency that provides residential care for people with disabilities for the last four years. Before coming to the United States, SEIU Local 509 Member A served as a civil engineer and plans to pursue a master's degree in engineering to continue her career as a civil engineer in the United States.

145. SEIU Local 509 Member A is married to a U.S. citizen. In February 2026, SEIU Local 509 Member A applied for adjustment of status together with their spouse's filing of a family-based petition on their behalf, and received an interview in July 2026. Her application remains pending.

146. SEIU Local 509 Member A is fearful that the AOS Policy will force her to depart the United States to become an LPR. Because Haitians are required to consular process at the U.S. Embassy in the Bahamas, if SEIU Local Member A were required to leave the United States to consular process, she would have to do so in a country where she has never lived and has no family support. To compound the harm, SEIU Local 509 Member A is subject to the administration's indefinite prohibition on processing lawful residency applications for people from Haiti. The indefinite prohibition on the issuance of immigrant visas to Haitian citizens who pursue consular processing, combined with the limitation on adjustment of status, will separate her from her husband and completely block her from obtaining lawful permanent residency in the United States for an indefinite period of time.

147. SEIU Local 509 Member B is a Haitian citizen who entered the United States in 2022. After entering the United States, SEIU Local 509 Member B, an expert in behavioral health and aging, was employed by a human services organization to coordinate geriatric social services in four Massachusetts cities. In early 2026, SEIU Local 509 Member B filed an immigrant visa petition including an application for a national interest waiver and an application for adjustment of status. Both applications remain pending.

148. SEIU Local 509 Member B plans to begin work on his Master of Social Work degree. He fears that his educational and career goals can only be achieved if he can pursue adjustment of status in the United States.

149. The AOS Policy significantly harms SEIU Local 509 Member B. Because Haiti is one of the 75 countries included in the administration's ban on the processing of immigration visas, *see infra* ¶ 60, and because of USCIS's limitation on adjustment of status, it will be effectively impossible for SEIU Local Member B to become an LPR if he cannot adjust status in the United States. SEIU Local 509 Member B is devastated by the prospect that he will lose the ability to live and work permanently in the United States.

**d. American Association of University Professors (AAUP)**

150. AAUP members are noncitizens who teach or conduct research in the United States and have applied for, or plan to seek, adjustment of status. Other members are U.S. citizens whose spouses or close relatives are pursuing adjustment. The challenged Policies put those applications at risk by making members' decision to seek permanent residence from within the United States an adverse discretionary factor. Members who instead pursue consular processing abroad could face extended absences that interrupt their teaching, research, and clinical work, affecting their academic appointments and opportunities for advancement.

151. The AOS Policy affects AAUP members who have built academic careers in the

United States and seek to remain here permanently. It directs USCIS to treat their decision to pursue a green card here instead of leaving the country for consular processing as a negative factor. Members must therefore seek a green card under a policy that weighs their choice against them, or consider leaving the United States to seek an immigrant visa. For those with teaching responsibilities, even a temporary absence can affect an entire term. If an instructor cannot return in time for the start of a term, the department may have to reassign or cancel their courses. A replacement hired on short notice may have little time to prepare, while students lose the continuity of instruction and advising they would otherwise have received. For members employed on a per-course basis, losing an assignment may also mean losing income, with little opportunity to secure other teaching work once the term has begun.

152. Research presents different difficulties. Scholarship requires continuity, and the ability to conduct it often depends on access to university laboratories, libraries, collections, and other institutional resources. An extended absence can interrupt experiments and data collection that require a researcher's presence. If the interruption also costs a member an appointment, the member may lose access to the facilities and materials needed to complete the work. The resulting gaps in teaching and scholarship can affect the record on which decisions about reappointment, promotion, and future academic employment are made, long after the member returns to the United States.

153. The Denial Policy creates an additional risk by allowing USCIS to deny an adjustment application without an RFE or NOID that would give the applicant an opportunity to supplement the record with evidence of their family ties, work in the United States, and other favorable equities relevant under the new discretionary framework.

154. The challenged Policies also harm members of AAUP–HFC and BU AAUP. AAUP-HFC had over 300 members across Harvard's schools as of February 2026, including

faculty and researchers. BU AAUP likewise includes faculty, graduate students, and other academic workers. Both chapters have noncitizen members seeking permanent residence while continuing their academic work. The prospect of having to pursue an immigrant visa abroad creates particular difficulties for these members, whose teaching assignments and research commitments cannot always accommodate an uncertain return date. An extended absence could affect their ability to maintain or advance in their academic positions, with consequences for the students and colleagues who depend on their work.

155. AAUP Member A is a citizen of the United Kingdom and a professor at Harvard University. They began teaching there in H-1B status after arriving in the United States in 2024. Their spouse, also a British citizen, accompanied them in H-4 status. USCIS approved their employment-based immigrant petition in September 2026, and they both are preparing to file applications for adjustment of status. AAUP Member A's current H-1B authorization expires in June 2027. They hope to obtain permanent residence without interrupting their academic appointment.

156. AAUP Member A teaches during the fall and spring semesters. They plan to visit the United Kingdom during the winter break, and they hope to complete their adjustment biometrics appointment before departing. The challenged AOS Policy directs USCIS officers to weigh AAUP Member A's decision to seek permanent residence in the United States against them, raising the prospect that they may have to pursue consular processing abroad and interrupt their teaching.

157. If USCIS denied AAUP Member A's adjustment application and they had to pursue an immigrant visa in the United Kingdom, AAUP Member A would need to attend a medical examination at least two weeks before her visa interview. On the day of the medical examination, they would also have to attend an in-person document review at the U.S. Embassy, followed by a

separate visit for her visa interview. Consular appointments and any additional processing could delay their return from the United Kingdom, causing them to miss part of the school year. Their department might then reassign their courses or, more likely, given their specialization, cancel them if no replacement were available. They would lose the opportunity to teach those courses, and their students would lose the opportunity to take them. That would in turn potentially harm their chances of success at promotion, given that teaching experience is weighed in tenure decisions.

158. AAUP Member B is a postdoctoral associate at Boston University, where they conduct psychotherapy research and provide clinical care. They hold a Ph.D. in Counseling Psychology. They first came to the United States in 2013 for their studies and are currently in H-1B status. AAUP Member B's research focuses on psychotherapy and long-term psychological well-being and requires ongoing collaboration with students and colleagues. They lead a research group and mentor graduate, post-baccalaureate, and undergraduate students and researchers. They also treat patients with severe and complex trauma, depression and anxiety, substance-use disorders, and suicidality, many of whom see AAUP Member B several times a week.

159. AAUP Member B is working toward a permanent academic appointment. They are registered to take their licensing examination this year, and, once fully licensed, they expect to assume additional clinical and supervisory responsibilities. Their university has informed AAUP Member B that it will sponsor them for permanent residence when they receive a promotion to a permanent research position at the end of the current academic year. AAUP Member B intends to make that transition while continuing the research, patient care, teaching, and student mentorship they have spent more than a decade building toward in the United States.

160. The AOS Policy places a new obstacle in that plan. If AAUP Member B becomes eligible to apply for adjustment, USCIS would be directed to weigh their decision to seek

permanent residence in the United States against them. A denial could require them to pursue an immigrant visa abroad instead. AAUP Member B does not believe they could realistically keep their position during an extended absence because their work depends on in-person patient care, student mentorship, and collaboration with colleagues on campus. An extended absence could interrupt treatment for patients with severe trauma and elevated suicidality, disrupt their research, and put their permanent academic position at risk. It would also interfere with plans to establish a life in the United States with their partner, also a postdoctoral associate, who is actively seeking an academic position in the Boston area to be closer to AAUP Member B.

161. AAUP Member C is a doctoral candidate in the field of applied psychology at Boston University. They are completing clinical training where they treat patients experiencing depression, anxiety, trauma, and suicidal thoughts. They explained that effective treatment depends in part on the trust patients develop with a particular clinician. If AAUP Member C had to leave the country after beginning a clinical appointment, transferring their patients to other providers would interrupt relationships that can take considerable time to establish, including for patients experiencing serious psychological distress.

162. AAUP Member C hopes to continue clinical work after completing their doctorate. They are concerned that employers may hesitate to hire a clinician whose ability to remain in the United States is uncertain. If they secured a position but later had to pursue an immigrant visa abroad, a prolonged absence could cost them that opportunity. AAUP Member C's patients would lose continuity of care, and AAUP Member C could have difficulty finding another position in their specialized field.

163. AAUP Member C currently maintains F-1 student status and is undertaking their clinical training through curricular practical training. Although they have not set a timetable for applying for adjustment of status, the challenged AOS Policy is already affecting their decisions

about where to build their career. By directing USCIS to weigh the choice to pursue adjustment in the United States against applicants, the Policy has made AAUP Member C question whether to pursue permanent residence here at all. They have begun considering professional opportunities in the United Kingdom and other English-speaking countries rather than focusing exclusively on employment in the United States.

164. AAUP Member D is a tenure-track Assistant Professor of History at a university in the U.S. South. They came to the United States in H-1B status in 2023 and planned to continue teaching and publishing while pursuing employment-based permanent residence through adjustment of status. Their university sought to extend their H-1B stay before the existing authorization expired in April 2026, but USCIS had not decided the request by the time the AOS Policy issued in May.

165. The AOS Policy changed the consequences of that delay. Because the Policy directs officers to treat failures to comply with the conditions of nonimmigrant admission as "highly relevant," AAUP Member D feared that remaining in the United States while their extension remained unresolved could later be held against them when they sought adjustment. Rather than take that risk, they left the United States for their home country in June 2026 while the extension request remained pending. They remain abroad.

166. That departure has already disrupted AAUP Member D's academic career. AAUP Member D arranged an early sabbatical, delaying their tenure clock by nearly an academic year and reducing their pay for the year. They hope to return to the university and resume their work, but the AOS Policy also raises the prospect that, even after AAUP Member D returns, they may later have to leave again to pursue an immigrant visa abroad. Another absence could further set back their teaching, research, and progress toward tenure. AAUP Member D's spouse and young child had planned to join AAUP Member D in the United States once their immigration situation

stabilized, and AAUP Member D's continued absence has also delayed their plan to establish a home together there.

167. AAUP Member E is a professor at a private college in the Mid-Atlantic. The school is sponsoring AAUP Member E for employment-based permanent residence, and AAUP Member E filed their adjustment application in 2025. AAUP Member E maintains H-1B status and continues to teach and conduct research while that application remains pending.

168. AAUP Member E filed for adjustment months before USCIS adopted the AOS Policy. They prepared their application under rules that did not treat their decision to seek permanent residence from within the United States as a negative factor. The new Policy now applies to their pending case and directs USCIS to weigh that choice against them.

169. Leaving the United States to pursue consular processing would carry especially serious consequences for AAUP Member E. They are subject to the travel ban (Proclamation 10998), which suspends immigrant-visa issuance and admission for covered individuals absent a limited exception or waiver. AAUP Member E has already had to forgo international travel for academic conferences because they could not obtain the visa documentation needed to ensure their return to the United States, and they have encountered substantial obstacles in seeking visa services abroad. If USCIS denied AAUP Member E's adjustment application and they had to pursue an immigrant visa abroad, those restrictions could prevent them from obtaining a visa and returning to the United States. An extended absence would interrupt AAUP Member E's teaching and scholarship and separate them from the community and life they have built here over the course of two decades.

**e. Individual Plaintiffs**

170. The challenged Policies are already affecting the individual Plaintiffs at different stages of the adjustment process. For some, the Policies have changed the questions they face and

the evidence they must present at interviews. For others, it has resulted in denial or created the prospect of having to leave jobs, families, and established lives in the United States to pursue permanent residence abroad.

171. Six days before Ms. Rojas's May 27, 2026 adjustment interview, USCIS issued the AOS Policy. Having learned that officers were questioning applicants about seeking adjustment rather than consular processing, she assembled a declaration and supporting evidence of favorable discretionary factors on short notice. She had not expected to prepare those additional materials for her marriage-based application.

172. At the interview, the officer asked why Ms. Rojas was seeking adjustment in the United States instead of consular processing. Ms. Rojas explained that her husband was in police academy training and that she works full-time in the United States. She also explained that she has no home in Mexico, that her immediate family are all in the United States, and that consular processing would likely result in prolonged separation and hardship. In response to the officer's questions about consular processing, her attorney raised her separate potential eligibility under 8 U.S.C. § 1255(i), and Ms. Rojas submitted the prepared declaration and supporting evidence, which the officer accepted. Ms. Rojas left the interview deeply concerned that her adjustment application will be evaluated under the newly announced policy.

173. USCIS approved the family-based immigrant petition filed by Ms. Rojas's husband the day after the interview, but her adjustment application remains pending. The AOS Policy has already affected how USCIS is adjudicating it. The officer questioned her choice to adjust in the United States and accepted the additional materials Ms. Rojas had prepared in response to the new discretionary framework. With her adjustment application still unresolved, she continues to rely on DACA for work authorization. The resulting uncertainty has made it harder for Ms. Rojas to plan for law school and make long-term financial and family-planning decisions with her husband.

174. Ms. Moreno had a similar experience at her July 28, 2026 adjustment interview. The officer repeatedly questioned her about her entry without inspection in 2000 and why she sought adjustment in the United States rather than consular processing abroad. The interview was conducted in an unusual and hostile manner, including an exchange about her TPS status that prompted her attorney to clarify that TPS provides protection, and the officer's discussion of a different, unrelated individual convicted of robbery and drug dealing while explaining why he did not view Ms. Moreno's case as warranting favorable discretion. Her attorney later submitted a written complaint to the agency.

175. The officer's questions about Ms. Moreno's entry and failure to pursue consular processing put her on notice that her choice of adjustment in the United States could weigh against her. If USCIS denies her adjustment application and she must pursue permanent residence abroad, her 15-year-old U.S. citizen son could lose the parent most responsible for his health and well-being. Her son has autism and requires ongoing counseling, treatment, and homebound instruction. Ms. Moreno oversees his daily care; her husband cannot take over those responsibilities alone, and the family has no other caregiver available. Her TPS renewal and associated work-authorization application also remain pending, while her wages and health insurance help support her son's treatment and the family's medical expenses. An adjustment denial requiring Ms. Moreno to leave the United States would threaten both the arrangements she has made for her son's care and the income and insurance on which the family relies.

176. Ms. Guardado attended her adjustment interview at the D.C. Field Office with her daughter on August 3, 2026. During the interview, the officer focused heavily on Ms. Guardado's decades-old immigration history, including her manner of entry and past unauthorized employment, while giving little weight to her lengthy residence in the United States, family ties, long-held TPS status, and lack of meaningful support in El Salvador. The officer stated that he was

strongly leaning toward denying her application and issuing a Notice to Appear. He also stated that he had previously worked as a correctional officer and compared Ms. Guardado's circumstances to those of incarcerated individuals separated from their families for violating the law. The officer further remarked, in substance, that if Ms. Guardado had not entered the United States unlawfully, her U.S. citizen children would not be U.S. citizens. Those comments left Ms. Guardado and her daughter deeply unsettled and reinforced their concern that her application was being viewed through a punitive lens rather than through an individualized assessment of the totality of her circumstances.

177. USCIS denied Ms. Guardado's adjustment application on September 2, 2026. Although the notice of denial expressly found her eligible for adjustment, USCIS denied her application in the exercise of discretion, citing her immigration history, a 1999 shoplifting arrest for which the charge was dismissed in 2001, and alleged failures to disclose that arrest on earlier TPS applications. The officer had not raised the arrest or alleged nondisclosures during her interview, leaving her no opportunity at that time to address matters USCIS later relied on to deny her application. The notice also warned that USCIS could issue a Notice to Appear if she did not depart within 33 days and stated that her adjustment-based employment authorization was invalidated or subject to revocation and that any advance parole based on the application was terminated. Ms. Guardado was not given an opportunity to supplement the record in response to the new discretionary framework before USCIS denied her application.

178. The denial has left Ms. Guardado facing the possibility of removal from the country where she has lived for more than 28 years. She has no family ties in El Salvador, other than one relative who could not provide any housing or financial support. Ms. Guardado has worked two jobs to meet her household expenses, including housing and insurance. At 56, she fears having to leave behind her children and work, to start over in a country where she has no established means

of supporting herself and where the work realistically available to her would largely consist of agricultural labor that she can no longer physically perform as she did when she was younger.

179. Even for the individual Plaintiffs who are awaiting their interviews, the AOS Policy is already shaping the choices they face. If USCIS denies adjustment, they may have to leave the United States to pursue permanent residence abroad, disrupting their work, education, and family lives.

180. Mr. Nwaozuzu's adjustment application remains pending under the AOS Policy. If USCIS denies adjustment and he must pursue an immigrant visa abroad, he would confront restrictions on immigrant visa issuance to Nigerian nationals under the 39-country travel ban, as well as the continuing uncertainty surrounding consular processing following the vacatur of the separate 75-country pause. An extended absence could interrupt his studies, jeopardize his CPT employment at Comcast, and deprive him of the income on which he relies.

181. In particular, Mr. Nwaozuzu's position at Comcast allows him to build specialized experience and professional relationships important to his career. The possibility of losing that progress because of the AOS Policy has already caused him significant stress and concern. He fears losing not only his current employment, but also the career opportunities he has diligently worked to establish in the United States.

182. Ms. Sierra likewise faces the possibility of having to pursue permanent residence abroad rather than remaining with her family, who are in Utah. Colombia was among the countries covered by the now-vacated 75-country immigrant-visa pause, and the resumption of consular processing remains uncertain. Given these circumstances, Ms. Sierra cannot count on a brief trip to pursue consular processing or a predictable return date.

183. If Ms. Sierra could not return promptly, the family would face difficult choices. Leaving the children in Utah would require her husband to care for them on his own while working

to support the family across two different countries. At the same time, taking the children abroad would uproot them from their home, community, and country, while relocating together would put the family's employment income at risk and even more severely disrupt the children's education and quality of life. Ms. Sierra worries about what these outcomes would mean for her young children and the stability she and her husband have worked hard to establish in the United States.

184. With her adjustment application also pending under the AOS Policy, Ms. Camargo faces the prospect of having to pursue permanent residence abroad just as she is trying to resume her career. Her pending adjustment application provides the basis for her request for work authorization; a denial would jeopardize that route back to the classroom. Having to remain abroad could extend an interruption that has already deprived her of teaching income and professional experience, potentially causing her to miss opportunities to return during the school year. She is worried that the uncertainty surrounding her application will make an already difficult return to work harder still.

185. Ms. Camargo's eight-year-old son is settled in school in North Carolina, where she and her husband own a house and have built their family life. Pursuing an immigrant visa abroad would severely hamper their ability to keep their home and break up the stability they have worked hard to achieve, whether their son accompanied her or remained in the United States. The prospect of being unable to return on a predictable timetable adds to her concern about her family's future at a time when she is already trying to regain her professional footing.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the INA, 8 U.S.C. § 1255, APA, 5 U.S.C. § 706(2)(A), (C) – Contrary to Law and in Excess of Statutory Authority

186. The paragraphs above are incorporated and reasserted as if fully set forth herein.

187. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," or in "excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

188. The AOS Policy is final agency action under the APA. 5 U.S.C. § 704.

189. The AOS Policy exceeds Defendants' statutory authority under 8 U.S.C. § 1255 and the INA.

190. Congress did not authorize USCIS to treat the statutory choice to seek adjustment in the United States, rather than depart and pursue consular processing abroad, as a categorical negative discretionary factor presumptively requiring denial of the application absent "unusual or even outstanding" justification. Instead, Congress delineated specific categories of noncitizens who must avail themselves of consular processing, and others who do not.

191. That AOS Policy also conflicts with Congress's decision through section 1255(a) that adjustment applications be adjudicated case-by-case by recreating a departure-based and intent-based categorical barrier to adjustment that Congress explicitly removed through amendments to section 1255.

192. The AOS Policy also exceeds Defendants' statutory authority because the INA does not authorize USCIS to categorically penalize noncitizens paroled into the country under 8 U.S.C. § 1182(d)(5) whose parole has ended for failing to leave the country before applying to adjust. Rather, when parole ends, the statute provides that that the "case shall continue to be dealt with in the same manner as that of any other applicant for admission." 8 U.S.C. § 1182(d)(5)(A).

193. The AOS Policy also exceeds Defendants' authority under section 1255(a) because it was issued as a policy memorandum and not issued by "regulation[]" using notice-and-comment rulemaking procedures.

194. The AOS Policy also conflicts with multiple provisions of the INA that recognize domestic adjustment as an ordinary feature of the INA, not an extraordinary indulgence that USCIS

could generally disfavor whenever consular processing was theoretically available absent "unusual or even outstanding" justification.

195. Because no statute authorizes the AOS Policy, and it is inconsistent with numerous provisions of the INA, it is not in accordance with law and must be set aside under 5 U.S.C. § 706(2)(A) and (C).

**COUNT II**

**Violation of the INA, 8 U.S.C. § 1255, APA, 5 U.S.C. § 706(2)(A) – Contrary to Law and in Excess of Statutory Authority (Unlawfully Retroactive)**

196. The paragraphs above are incorporated and reasserted as if fully set forth herein.

197. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or in "excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C).

198. The AOS and Denial Policies are final agency action under the APA. 5 U.S.C. § 704.

199. The two Policies together exceed Defendants' statutory authority under 8 U.S.C. § 1255(a) because together they operate retroactively to applications for adjustment of status filed before their effective dates to require the denial of adjustment applications under the AOS Policy without any opportunity to submit evidence relevant to that policy as a result of the Denial Policy without statutory authorization to do so.

200. Both policies are therefore not in accordance with law and must be set aside under 5 U.S.C. § 706(2)(A) or (C).

**COUNT III**

**Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary and Capricious**

201. The paragraphs above are incorporated and reasserted as if fully set forth herein.

202. The APA provides that courts "shall . . . hold unlawful and set aside agency action"

that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

203. The Policies are final agency action under the APA. 5 U.S.C. § 704.

204. The Policies are arbitrary and capricious because in adopting the new Policies and abandoning prior policies and precedents, Defendants issued policies that are inconsistent with statutes and regulations, and therefore substantively unreasonable, and did so without adequate explanation; overturned decades of precedent sub silentio; failed to acknowledge that the Policies' conclusions represent a change in the agency's longstanding policy; failed to explain the Policies' departure from controlling precedents or how the Policies are consistent with those precedents; failed to articulate a reasoned explanation for the change in policies; did not consider the serious reliance interests implicated in such a sweeping change, including applicants' reliance on the expectation that they will be able to supplement their applications should relevant governing law change after filing their applications; entirely failed to consider important aspects of the problem, including the combined impact of the Policies and other recent policy changes affecting the availability of consular processing; offered explanations for the decision that run counter to the evidence before the agency and are contrary to controlling Board decisions; failed to consider significant alternatives; relied on incorrect and inaccurate data; relied on irrelevant factors that Congress did not intend USCIS to consider; and relied on a facially implausible justification for the Policies. In addition to these reasons, the Denial Policy is also arbitrary and capricious because it fails to consider its impact on applicants for adjustment subject to the AOS Policy and its interaction with the AOS Policy. It therefore fails to consider important aspects of the problem it is purporting to address, including the combined effect of imposing new substantive standards on already-pending adjustment applications while withdrawing the process through which applicants might otherwise have responded to those standards before denial.

205. Because the Policies are arbitrary and capricious, they must be set aside under 5 U.S.C. § 706(2)(A).

**COUNT IV**

**Violation of the APA, 5 U.S.C. §§ 553, 706(2)(D) – Notice and Comment and Without Observance of Procedure Required by Law**

206. The paragraphs above are incorporated and reasserted as if fully set forth herein.

207. A reviewing court must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

208. The APA, 5 U.S.C. § 553, requires that agencies provide public notice of, and opportunity to comment on, legislative rules before their promulgation. *See* 5 U.S.C. § 553(b), (c).

209. The APA also requires that any substantive rule must be published at least 30 days prior to its effective date. *See* 5 U.S.C. § 553(d).

210. The Policies are legislative rules within the meaning of the APA.

211. Defendants did not comply with the APA's procedural requirements when USCIS made the Policies immediately effective without providing any opportunity for the public to submit comments.

212. No exception to notice-and-comment procedures applies to either Policy.

213. Defendants' failure to provide for notice and comment violates 5 U.S.C. § 553(b) and (c) and renders the Policies invalid.

214. Defendants' failure to publish the Policies 30 days before their effective date violates 5 U.S.C. § 553(d) and renders the Policies procedurally invalid.

**COUNT V**

**Violation of the APA, 5 U.S.C. § 706(2), USCIS Policy Manual, BIA Precedent – *Accardi* Doctrine – Contrary to Law and Arbitrary and Capricious**

215. The paragraphs above are incorporated and reasserted as if fully set forth herein.

216. The Policies are contrary to the express terms of the statute, controlling BIA precedent, and the USCIS Policy Manual, and should therefore be set aside under the principle articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *see Morton v. Ruiz*, 415 U.S. 199, 235 (1974).

217. The AOS Policy is inconsistent and conflicts with controlling Board of Immigration Appeals precedent setting policies for the exercise of discretion regarding adjustment applications, *see* 8 C.F.R. § 1003.1(g)(1), including that (1) "[i]n the absence of adverse factors, adjustment will ordinarily be granted, still as a matter of discretion." *Matter of Arai*, 13 I. &N. Dec. at 495–96; *Matter of Blas*, 15 I. & N. Dec. at 641; (2) "[n]otwithstanding evidence establishing preconceived intent, an application for adjustment of status should as a general rule be granted in the exercise of discretion in the case of an immediate relative," *Matter of Cavazos*, 17 I. & N. Dec. at 215; *Matter of Ibrahim*, 18 I. & N. Dec. at 57; (3) "if an individual is not within the scope of the section 245(c)(2) [8 U.S.C. § 1255(c)(2)] bar and if his or her unauthorized employment is the only adverse matter of record, adjustment of status should not ordinarily be denied in the exercise of discretion," *Matter of Khan*, 17 I. & N. Dec. at 511; (4) overstaying a period of authorized stay is not a per se adverse factor for purposes of the discretionary adjustment determination, *cf. Matter of Arai*, 13 I. & N. Dec. at 495; (5) deciding to apply for adjustment itself, as opposed to seeking consular processing, is not itself an adverse factor, *cf. id.*; and (6) "unusual or outstanding equities" are not required to merit a favorable exercise of discretion in the absence of particularly serious adverse factors, *Matter of Mendez-Moralez*, 21 I. &N. Dec. at 300; *Matter of Edwards*, 20 I. & N. Dec. at 195; *Matter of Marin*, 16 I. &N. Dec. at 585.

218. The AOS Policy is also inconsistent with the USCIS Policy Manual, which articulates, in reliance on Board precedent, *see* 8 C.F.R. § 1003.1(g)(1), permissible positive and negative factors USCIS adjudicators may consider in exercising discretion. *See* USCIS, *Policy*

*Manual*, vol. 7, pt. A, ch. 10 (current as of Sep. 23, 2026), https://perma.cc/AY35-LY9Y. Like Board precedent, the Manual makes clear that application of the "unusual or outstanding equities" standard is the exception, applicable in cases involving significant negative equities, and not the norm.

219. In addition, the AOS Policy is inconsistent with the Policy Manual's directive that if there are no negative factors to weigh against the positive factor of a noncitizen's threshold eligibility for the benefit sought, denial of the benefit would be an inappropriate use of discretion.

220. The AOS Policy subverts this framework, directing officers to require a showing of "unusual or outstanding" equities in all circumstances if an individual has applied for a green card in the United States rather than availed themselves of consular processing abroad.

221. The Denial Policy is inconsistent with the Policy Manual because it categorically directs that it be applied to already-pending benefit requests, including adjustment applications, without accounting for the retroactivity determination the Policy Manual requires before a changed policy is applied retroactively to a pending adjustment application. *See* 7 USCIS *Policy Manual*, pt. B, ch. 2 (current as of Oct. 2, 2026), https://perma.cc/A9KN-9G9H.

222. Accordingly, Defendants' actions, as set forth above, fail to comply with the issuing agencies' regulations and controlling policies and are therefore contrary to law, arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A); *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954); *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).

**COUNT VI**

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution**

223. The paragraphs above are incorporated and reasserted as if fully set forth herein.

224. The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law. . . ." The Due Process Clause "applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

225. As discussed above, the statutes and regulations governing adjustment of status grant eligible noncitizens the right to an adjudication of their applications. These laws therefore create a "legitimate claim of entitlement" protected under the Due Process Clause. *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). Defendants therefore must afford applicants a fair process before they deny those entitlements, including an opportunity not just to submit, but to substantiate their claims.

226. The Due Process Clause requires notice and opportunity to be heard prior to a deprivation of a liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). USCIS's implementation of the Policies violates the due process rights of applicants for adjustment of status because the policies together do not provide applicants with adequate or fair procedures to ensure applicants receive notice that their pending application to adjust may be denied because of the Denial Policy, or any, let alone reasonable opportunity to submit new evidence relevant to the applications to adjust when those applications were filed before the effective date of the AOS Policy before their adjustment application is denied based on the Denial Policy. *See A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that the Policies are contrary to law and in excess of statutory authority, violate APA notice-and comment requirements, are arbitrary and capricious, violate the *Accardi* doctrine, and violate the Due Process Clause.

2. Temporarily restrain, preliminarily enjoin, and/or stay the Policies pursuant to Federal Rule of Civil Procedure 65(a) and (b) and/or 5 U.S.C. § 705 during pendency of this suit;

3. Permanently enjoin the Policies;

4. Enter an order directing Defendants to adjudicate individual Plaintiffs', associational Plaintiffs' members, and organizational Plaintiffs' clients' adjustment applications consistent with controlling Board precedent.

5. Enter an order vacating and setting aside the Policies pursuant to 5 U.S.C. § 706;

6. Award Plaintiffs' counsel attorneys' fees and costs for this action; and

7. Award such other and further relief the Court may deem just, equitable, and proper.

Dated: October 5, 2026

Respectfully submitted

/s/ Erez Reuveni
Erez Reuveni (MA BBO No. 666769)
Briana M. Clark* (DC Bar No. 1735505)
Lisa Graybill* (TX Bar No. 24054454)
Robin F. Thurston* (DC Bar No. 1531399)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 316-9538 (Reuveni)
ereuveni@democracyforward.org
bclark@democracyforward.org
lgraybill@democracyforward.org
rthurston@democracyforward.org

Jennifer R. Coberly* (DC Bar No. 90031302)
**AMERICAN IMMIGRATION LAWYERS ASSOCIATION**
1331 G. St. NW
Washington, DC 20005
Phone: 202-507-7692
Jcoberly@AILA.org

Leslie K. Dellon* (DC Bar No. 250316)
Christopher Opila* (DC Bar No. 6046494)
Rebecca Cassler* (DC Bar No. 90017398)
**AMERICAN IMMIGRATION COUNCIL**
PMB2026
2001 L Street NW, Suite 500
Washington, DC 20036
Telephone: (202) 507-7530 (Dellon)
ldellon@immcouncil.org
copila@immcouncil.org
rcassler@immcouncil.org

Sarah Wilson*
David Kim*
**COLOMBO & HURD PL**
301 E. Pine Street, Suite 450
Orlando, FL 32801
(407) 478-1111
swilson@colombohurd.com
dkim@colombohurd.com

*Counsel for All Plaintiffs*

*Motion to appear *pro hac vice* forthcoming